521 A.2d 474

**Robert E.J. CURRAN, Esquire, Executor of the Estate of Victor S. Panaccion, Appellant,**

**v.**

**Herman P. EBERHARTER, Appellee.**

**Robert E.J. CURRAN, Esquire, Executor of the Estate of Victor S. Panaccion, Appellee,**

**v.**

**Herman P. EBERHARTER, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 22, 1986.

Filed Feb. 6, 1987.

66

Garland D. Cherry, Sr., Media, for appellant in No. 1086 and for appellee in No. 1112.

Edward C. Mengel, Jr., Philadelphia, for appellant in No. 1112 and for appellee in No. 1086.

Before WIEAND, OLSZEWSKI and CERCONE, JJ.

OLSZEWSKI, Judge:

This is a cross appeal from the grant of defendant Herman P. Eberharter's ("Eberharter") motion for judgment n.o.v. Finding no error in the trial court's ruling, we affirm the judgment.

## Background

Upon review of the grant of a motion for judgment n.o.v., all of the evidence, and all reasonable inferences therefrom, must be viewed in a light most favorable to the verdict winner. *Northwest Savings Assoc. v. Distler*, 354 Pa.Super. 187, 511 A.2d 824 (1986). Using this standard, the evidence adduced at trial can be summarized as follows.

The cause of action against Eberharter for breach of an escrow agreement dates from January of 1974, when Panaccion entered into an agreement for the sale of his lumber business with Herman F. Yerger ("Yerger"), a nonparty in the present suit.[1] A new corporation, Clifco Millwork and Lumber Co. ("Clifco"), was formed and designated in the sales agreement as the actual buyer. After Panaccion signed the agreement of sale, he met with an attorney from the law firm of Stradley, Ronon, Stevens & Young ("Stradley").[2] The attorney advised Panaccion that the terms of the agreement of sale were not in Panaccion's best interests. In an effort to improve Panaccion's lot, another attorney from Stradley, defendant Eberharter, was brought

1. Panaccion also brought suit against Yerger. That action is not before this Court.

2. A cause of action for legal malpractice was brought against Stradley. After the jury returned a verdict in favor of Panaccion, the court granted a partial judgment n.o.v. in Stradley's favor and reduced the award of damages. The cross appeal of Panaccion and Stradley is addressed in a separate opinion by this Court.

in to renegotiate an agreement that was more favorable to Panaccion.[3]

The closing took place on February 18, 1974, at which time Panaccion received a down payment of $100,000.00. The balance of the total sale price of $661,886.40 was to be paid during the course of eleven years. At the time of the closing the parties discussed the terms of an escrow agreement that was required pursuant to the terms of the agreement of sale. It was agreed that Eberharter would prepare the escrow agreement and act as escrow agent. Eberharter subsequently drafted an escrow agreement and forwarded it to the attorney for Clifco and Yerger. That agreement provided, in part, as follows:

## ESCROW AGREEMENT

Escrow Agreement dated as of February 18, 1974, by and among Victor S. Panaccion ("Seller"), Clifco Millwork and Lumber, Inc. ("Buyer"), Herman F. Yerger and Edward D. Sullivan, shareholders of Buyer ("Shareholders") and Herman P. Eberharter of Stradley, Ronon, Stevens & Young ("Escrow Agent").

## WITNESSETH:

1. Pursuant to an Agreement dated December 27, 1973, as amended, between Buyer and Seller (the "Agreement"), shareholders have delivered to Escrow Agent certificate No. 1 for 800 shares and certificate No. 2 for 200 shares representing all of the 1,000 outstanding common shares of Buyer, for the purpose of securing payment of the purchase price of certain assets purchased by Buyer from Seller pursuant to the Agreement.

2. Escrow Agent shall retain said shares until such time as the obligations of Buyer under the agreement have been satisfied in full and, specifically, shall release said shares only upon written direction to do so signed by Buyer and Seller, or Seller's personal representative if Seller be then deceased.

3. In the event of any dispute as to whether Buyer's obligations under the Agreement have been satisfied, Escrow Agent shall be authorized in his discretion to apply to any court of competent jurisdiction for instructions, and to abide by the decision of such court. The costs of any such action shall be the responsiblity of Buyer, Seller and Shareholders or such of them as the court may direct.

3. Eberharter was successful in obtaining several modifications to the agreement of sale, most noteably the addition of a security agreement giving Panaccion a secured interest in the assets of the lumber business. There is no claim against Eberharter in regard to the security agreement.

4. The Shareholders shall be entitled to vote the escrowed shares registered in their respective names during the term of this Escrow Agreement.

5. It is expressly agreed that if additional shares of stock of Buyer are issued during the term of this Escrow Agreement, with or without consideration, or whether by way of recapitalization, stock dividend, merger or reorganization of any kind, such additional shares shall be delivered to Escrow Agent to be held by him subject to the terms of this Escrow Agreement.

6. Escrow Agent may resign at any time by appointment as successor Escrow Agent any partner of Stradley, Ronon, Stevens & Young, or such other person as Buyer, Seller and Shareholders may approve.

7. Escrow Agent shall be protected and shall incur no liability for or in respect of any action taken, suffered or omitted by him in reliance upon affidavit, statement, certificate, request, consent, agreement or other instrument whatsoever, not only as to its due execution and validity and the effectiveness of its provisions, but also as to the truth and accuracy of any information therein contained, which Escrow Agent in good faith believes to be genuine and to have been signed or presented by a proper person or persons duly authorized. Escrow Agent may perform any of his duties hereunder by or through agents or employees and he shall not be answerable or acountable for any act, default, neglect or misconduct of any such agent or employee, provided that reasonable care has been exercised in the selection and in the continued employment of any such agent or employee; nor shall he be otherwise answerable or accountable in any circumstances whatsoever except for the safekeeping of the certificates deposited hereunder and for gross negligence or bad faith. He may consult with counsel relating to his duties or responsibilities hereunder and shall not be liable for any act taken, suffered or omitted by him in good faith on advice of such counsel.

8. This Escrow Agreement may be executed in several counterparts, each of which shall be deemed an original.

IN WITNESS WHEREOF, the parties have signed or caused this Escrow Agreement to be signed as of the day and year first written.

Attest:

CLIFCO MILLWORK & LUMBER, INC.
Buyer

By: _____ President
Herman F. Yerger

Witness:

_____

_____
Victor S. Panaccion, Seller

_____

_____
Herman F. Yerger, Shareholder

_____

Edward D. Sullivan, Shareholder

_____

Herman P. Eberharter, Escrow Agent

_____

Panaccion executed the agreement and returned it to Eberhart. Thereafter, the attorney for Clifco proposed to amend paragraph 5 of the escrow agreement to provide as follows:

5. It is expressly agreed that if additional shares of stock of Buyer are issued during the term of this Escrow Agreement, or if during the term of this Escrow Agreement any or all of the shares of stock of Buyer initially issued are re-issued, either in the same or in varying amounts to the original stockholders or to others, with or without consideration, or whether by way of recapitalization, stock dividend, merger or reorganization of any kind, such additional or substituted shares, as the case may be, shall be delivered to the Escrow Agent, to be held by him subject to the terms of this Escrow Agreement.

In a letter to Panaccion dated March 15, 1974, Eberharter stated that both he and another Stradley attorney believed the amendment had "no legal effect whatsoever" and was proposed by the buyer "to satisfy Mr. Yerger's whim." (R. 272a). Panaccion signed the amendment and returned it to Eberharter.

Pursuant to the terms of the agreement, all of the issued and outstanding shares of Clifco stock would be held in escrow. There were 1,000 issued and outstanding shares of Clifco, 800 shares in the name of Yerger, which was represented by certificate No. 1, and 200 shares in the name of Edward D. Sullivan, which was represented by certificate No. 2. Eberharter took custody of these stock certificates.

In October of 1974, Eberharter learned from Clifco's attorney that Yerger had transferred ownership of his Clifco shares to Emblem-Flag Company ("Emblem"), another entity which he controlled.[4] Upon receiving a written confirmation of the request to transfer the ownership in the Clifco shares from Yerger's attorney, Eberharter released certificate No. 1 from escrow and substituted certificate No. 3 which identified Emblem as the owner of the Clifco stock. In September of 1975, the other Clifco shareholder, Edward D. Sullivan, died and pursuant to a buy-back agreement between Clifco and this shareholder, Clifco was required to purchase his shares. Eberharter learned that Emblem had decided to acquire the remaining shares of Clifco so that it would become the 100% owner of Clifco. Eberharter agreed to the transfer and on November 18, 1975, he substituted certificate No. 4 in the name of Emblem for certificate No. 2 that was issued in Sullivan's name. Panaccion was not notified of the two exchanges of the certificates.

The escrow agreement permitted the owners of the Clifco shares to vote the share without the approval of Panaccion. In February of 1976, Emblem[5] passed a shareholder resolution permitting the directors of Clifco to sell the real estate to the Great A & P Tea Co. ("A & P") for $243,000.00.

In June of 1977, Panaccion learned that the assets of the lumber business in which he had a secured interest had been dissipated. On October 8, 1980, Panaccion filed suit against Eberharter claiming the latter breached his duties under the escrow agreement in the following ways: by failing to take steps to notify him of the transfer of the escrowed stock; by failing to get his approval for the transfer; and by failing to insist on the compliance of the escrow agreement.

4.  Yerger owned 75% of the stock of Emblem and his wife owned the remaining shares. The transfer of ownership to Emblem had actually occurred in April of 1974, and was apparently accomplished for tax purposes.

5.  In January of 1976, Yerger transferred his 75% ownership interest in Emblem to the other Emblem shareholder, his wife.

The jury returned a verdict in Panaccion's favor and against Eberharter in the amount of $548,000.00. The trial court granted Eberharter's motion for judgment n.o.v., finding that there was no evidence on the record supporting Panaccion's claim that Eberharter acted in breach of the escrow agreement. In so ruling, the trial court reversed its earlier interpretation of the escrow agreement. During trial, the court determined that pursuant to paragraph 2 of the escrow agreement, Eberharter was required to obtain Panaccion's written approval before releasing the stock certificates. The court reasoned that the same restriction applied to paragraph 5, which governed when the stock was reissued. In instructing the jury, the court stated that, as a matter of law, Eberharter violated the escrow agreement by releasing the certificates without first obtaining Panaccion's approval but that the question of whether the breach was the cause of the loss was for the jury's determination. The court reversed itself when, on review of the post-trial motions, it ruled that paragraph 5 did not impose a duty on the escrow agent to secure Panaccion's approval before exchanging the certificates. In short, the court found there was no evidence on the record indicating that Eberharter had failed to perform his duties under the escrow agreement.

## Panaccion's Appeal

In contesting the grant of the judgment n.o.v., Panaccion claims that Eberharter was not authorized to release the escrowed shares without Panaccion's approval under paragraph 5 of either the original escrow agreement or the amended agreement. The resolution of this claim requires us to interpret the language of the escrow agreement.

The parties agreed at trial that the construction of a writing, such as the escrow agreement, is a question of law subject to the determination of the court. Upon review of a question of law, this Court need not defer to the finding of the trial court. *Erie Insurance Exchange v. Transamerica Insurance Co.*, 352 Pa.Super. 78, 507 A.2d 389 (1986). In making our determination, we are guided by

general principles of contract law as well as by specific rules which govern when an escrow agreement is implicated.

■ When a written agreement is questioned, the intent of the parties is ascertained by that writing and where the words are clear and unambiguous, the language of the agreement is determinative. *See e.g. Woytek v. Benjamin Coal Co.,* 300 Pa.Super. 397, 446 A.2d 914 (1982). An agreement must, however, be interpreted as a whole and effect given to all of its provisions. *Central Dauphin School District v. American Casualty Co.,* 493 Pa. 254, 258, 426 A.2d 94, 96 (1981). Of particular importance here is the rule that an escrow agent is bound to follow the terms of the escrow agreement. *Paul v. Kennedy,* 376 Pa. 312, 315, 102 A.2d 158, 159 (1954); *Mursor Builders, Inc. v. Roddy Realty, Inc.,* 459 F.Supp. 1317, 1322 (M.D.Pa.1978). Further, the powers of an escrow agent are limited to those enumerated in the escrow agreement. *In re Dolly Madison Industries, Inc.,* 351 F.Supp. 1038, 1042 (E.D.Pa.1972). *See generally Angelcyk v. Angelcyk,* 367 Pa. 381, 80 A.2d 753 (1951).

The question here is whether the escrow agent acted outside of his grant of authority. We agree with both the reasoning and conclusion of the trial court that there is no evidence on the record supporting a claim that Eberharter breached his duties under the escrow agreement.

■ After carefully reviewing the escrow agreement, particularly paragraph 5, we find no language that obligated Eberharter to first notify Panaccion and to obtain his approval before transferring the certificates. To the contrary, the agreement expressly contemplates the transaction that occurred here, e.g., the reissuance of the original shares. The only limitation in this regard is the requirement that the reissued shares (called "substituted" shares in the language of the agreement) be held by the escrow agent and subject to all the terms of the escrow agreement. As the trial court found, there are no facts of record indicating that this was not done. At all times, the escrow

agent held all of the issued and outstanding shares of stock and retained control over those shares.

We believe that such an interpretation of the escrow agreement is both reasonable and consistent with the spirit of the agreement. Because the shares always remained in the escrow agent's control, the purpose of the agreement—securing the unpaid obligation—was respected. If we were to accept Panaccion's argument that his prior authorization was necessary, paragraph 5 of the escrow agreement would be meaningless; no stock could be reissued—even upon the death of a shareholder—without first obtaining Panaccion's prior approval. In short, Panaccion's interpretation of the escrow agreement is overly restrictive and inconsistent with the language of the agreement.

Panaccion argues, however, that this conclusion is unwarranted because the provision of the escrow agreement upon which the trial court relied, paragraph 5, as amended, is inapplicable. Panaccion asserts that the amendment to paragraph 5 changed the legal effect of the original provision, but that Eberharter told him that the amendment had no legal effect. According to Panaccion, Eberharter is estopped from relying on the amended version of the escrow agreement.[6]

In our opinion, the circumstances here do not trigger the invocation of the estoppel doctrine. "Equitable estoppel arises when a party by acts or representation intentionally or through culpable negligence, induces another to believe that certain facts exist and the other justifiably relies and acts upon such belief, so that the latter will be prejudiced if the former is permitted to deny the existence of such facts." *Straup v. Times Herald*, 283 Pa.Super. 58, 71, 423 A.2d 713, 714 (1980). In short, the doctrine is one of

---

6. Panaccion asserts the estoppel theory in order to avoid an unfavorable construction of the agreement. We note, however, that Panaccion did not attempt to void the agreement on grounds of fraud or the like. We note also that the amended agreement is the final contract between the parties and was in effect when the acts which gave rise to this dispute occurred. For these reasons, the amended version should be given effect.

fairness; it prevents a party from taking a position that is inconsistent to a position previously taken and, thus, disadvantageous to the other party. *Commonwealth ex. rel Gonzalez v. Andreas,* 245 Pa.Super. 307, 311–312, 369 A.2d 416, 418 (1976).

■ In view of these principles, we conclude that Panaccion's argument is misdirected. There is no evidence on the record that Eberharter's construction of amended paragraph 5 was inconsistent with his interpretation of the original version of paragraph 5. Eberharter has never maintained that Panaccion's approval was required prior to the exchange of the certificates.[7] In our view, the "inconsistency" of which Panaccion speaks arose not out of Eber-

7. Panaccion refers us to the testimony of Eberharter regarding his interpretation of the escrow agreement:

Q. Mr. Eberharter, do you agree that this Escrow arrangement would have prevented the sale of the corporation to people that Panaccion did not have confidence in?

A. Yes. You could have used it to prevent that.

(N.T. 135, R. 39a). For two reasons, Eberharter's statement is not inconsistent with his interpretation of the escrow agreement. First, it is evident that his answer was in response to a hypothetical question. Second, this response cannot be taken out of context. On cross examination Eberharter's testimony as to this matter was as follows:

Q. Mrs. Eberharter, do you agree that this Escrow Arrangement would have prevented the sale of the corporation to people that Panaccion did not have confidence in?

A. Yes. You could have used it to prevent that.

\* \* \* \* \* \*

THE WITNESS: It would have prevented the sale of shares of the corporation.

BY MR. CHERRY:

Q. In January of 1976, who controlled Clifco Millwork and Lumber? Who controlled C.M.L., do you know?

A. In January of '76?

Q. Yes.

A. Well, we had the shares in escrow.

Q. My question was: who controlled the corporation?

\* \* \* \* \* \*

A. Well, Emblem Flag owned—

Q. —who was supposed to pay Mr. Panaccion?

A. Emblem Flag Company owned its shares.

Q. Well, who owned Emblem Flag?

A. Yerger.

\* \* \* \* \* \*

Q. On January 4th of 1976, Herman Yerger was not the owner and had no interest in Emblem; were you aware of that?

A. No.

Q. Well, according to you the Escrow Agreement would have prevented the sale of the corporation to people that Mr. Panaccion didn't have confidence in?

A. Yes, if I'd known about it.

Q. Well, how were you going to know about if under the Escrow Agreement he could switch shares.?

     *     *     *     *     *     *

BY MR. CHERRY:

Q. Mr. Eberharter, you had no control over a transfer of the Emblem shares, did you?

A. It didn't make any difference, because I had control over the Clifco shares. I could take Clifco away from Emblem Flag, I could have taken it away from anybody.

     *     *     *     *     *     *

A. I don't know how to answer that other than the way I answered it. I had control of the Clifco shares. If I had been advised of anything—any impairment of the payment or anything wrong, or any suspicion that Mr. Panaccion had, I could have looked into it, and if there had been violations of any of the agreements I could have taken Clifco away from whoever owned it.

Q. Was it a violation of the agreement when Mr. Yerger gave his shares to his wife on January 4th of 1976?

A. What agreement?

Q. Of any agreement? Was it a violation of any agreement? Would that have triggered any right on your part as an Escrow Agent?

A. It depends upon what the circumstances of giving them to his wife were. I would not think so, as long as they were still married. (N.T. 135–139).

When asked to explain the language of amended paragraph 5, Eberharter testified as follows:

A. (The amendment to paragraph 5) broadened and strengthened the escrow agreement because it specified another thing which I believe was encompassed within the original language anyway, but it did make it specific, and if at the time I agreed to this I was imagining what might have happened it would have been pure speculation as to what, you know, particular type of substitution might happen in the future, just like I would be speculating on whether there was ever going to be a merger or recapitalization.

Q. Did you ever discuss the provisions of paragraph 5, the amended paragraph 5, with Mr. Panaccion?

A. I don't have a specific recollection. I believe I—I just don't—I did send it to him to be signed of course.

Q. Well, when you sent it to him to be signed did you explain to him or talk to him by phone and say that this language makes it clear that they can sustitute shares for No. 1 and No. 2?

A. I have a recollection I may have remarked that I didn't think it made any legal difference in the obligations. Now, whether I make that remark to (Clifco's attorney) or what, I just don't recall. (N.T. 100). There is no evidence of record that Eberharter ever told Panaccion that his approval was necessary prior to the transfer of the certificates.

harter's word, act, or silence, but out of a determination made in hindsight that the final version of the escrow agreement did not express his wishes.

In addition, there is no indication on the record that Eberharter induced Panaccion to believe that certain facts existed which Eberharter now attempts to deny. "An 'inducement' sufficient to create an estoppel may consist of words or conduct that intentionally or negligently causes another to believe that a promise has been made or that a particular state of facts exists." *Havas v. Temple University of the Commonwealth System of Higher Education*, 357 Pa.Super. 353, 356, 516 A.2d 17, 19 (1986). There is no evidence that Eberharter, in advising Panaccion to accept the amendment, made a promise for a future performance. Nor can Eberharter's representation be construed as an expression of fact which was sufficient to induce reliance. *See Northcraft v. Edward C. Michener Assoc.*, 319 Pa.Super. 432, 466 A.2d 620 (1983) (ambiguous statements made in writing were insufficient to establish estoppel). *Compare Straup*, 283 Pa.Super. 58, 423 A.2d 713 (1980) (statements, acts and silence by newspaper clearly demonstrated that a contract existed by estoppel). At most, Eberharter's statement that the amendment had "no legal effect" was a legal opinion as to the implications of that provision.

Based upon Ebherharter's opinion regarding the amendment, Panaccion could not have been deceived into thinking that his approval was necessary before any action whatsoever was taken with the certificates. Such an interpretation conflicts with the language of both the amended agreement and the original provision. In any event, there is no evidence that Panaccion ever received any assurances that his approval was necessary pursuant to the escrow agreement. In essence, Panaccion faults Eberharter either for failing to grasp the legal significance of the amendment or for failing to explain the implications of the amendment. Such allegations would more properly impose liability on Eberharter for negligence under a claim brought in tres-

78

pass, not in assumpsit. No such claim of malpractice was brought against Eberharter.

Having determined that there is no basis for estoppel, we conclude that Eberharter's performance as escrow agent must be evaluated pursuant to the terms of the final agreement. As we interpret that agreement, the issuance or reissuance of the Clifco stock was permissible and Eberharter was not required to obtain Panaccion's prior written approval before substituting the certificates. The only limitation on Eberharter's authority was the requirement in paragraph 5 that the stock shares remain in the control of the escrow agent and subject to the provisions of that agreement. There is no evidence that this was not done. Accordingly, there was no material fact at issue to be submitted to the jury regarding Panaccion's claims that Eberharter breached the escrow agreement. Thus, the trial court properly entered judgment in Eberharter's favor.

In a cross appeal by Eberharter, he questions whether this cause of action is actually one for malpractice and, thus, time-barred pursuant to the two year statute of limitations on such actions. Our determination of this case has made it unnecessary to address the statute of limitations issue.

Order affirmed.