644 A.2d 791

In re ESTATE OF Theodora H.D. SIMMONS–CARTON a/k/a Theodora Helena D. Carton a/k/a Dory Simmons, Deceased.

**Appeal of Mirjam SIMMONS–CARTON, Mother, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 5, 1994.

Filed July 12, 1994.

642

F. Curtis Davis, Jr., Philadelphia, for appellant.

Laurence I. Tomar, Langhorne–Newton, for appellee.

Before KELLY, FORD ELLIOTT and BROSKY, JJ.

FORD ELLIOTT, Judge:

This is an appeal from the June 18, 1993 order of the Court of Common Pleas of Bucks County which reversed the decision of the Register of Wills to revoke Letters of Administration previously granted to appellant, Mirjam Simmons–Carton, and appellee, Donald Simmons.

This case involves the tragic death of Theodora "Dory" Simmons on December 24, 1988 in an automobile accident. Dory was twenty-three years old at the time. At issue is whether Dory's mother, Mirjam Simmons–Carton, and her alleged father, Donald Simmons, should both be named as co-administrators of Dory's estate. Dory died intestate. Her estate consists primarily of potential assets from pending wrongful death actions.

Before addressing the merits of this appeal, an understanding of the factual and procedural history of this matter is necessary. As much of the factual history is disputed by Mirjam and Donald, the trial court in its opinion dated June 18, 1993, recites both Mirjam's and Donald's version of the facts. We adopt that portion of the trial court opinion for purposes of this review.

Mirjam Simmons testified that she was the mother of the decedent who was born on January 3, 1965 in the Netherlands. She further testified that she had met Donald Simmons the spring of 1963 and had a relationship with him until around Christmas time of that year. She denied access with Simmons in the spring of 1964 and did not see him again until October of 1964 when she was already pregnant. (3/3/92 N.T. 12) However, later in her testimony she acknowledged that she may have seen Donald 'in the neighborhood' sometime in the spring of 1964. (3/3/92 N.T. 17)

Ms. Simmons then testified that she believed she was made pregnant by a person other than Donald Simmons with whom she had a brief relationship in the spring of 1964. In the course of this testimony, she refused to name the alleged father 'as matter of principle'. (3/3/92 N.T. 17, 18) She claimed it was because of this principle that no person was named as the father on the decedent's birth certificate.

Sometime in 1965 Donald Simmons returned to the United States and early in 1966 Mirjam Simmons came with her daughter for a visit. She returned to the Netherlands for a brief time, came back to the United States in November 1966 and she married Donald Simmons, assuming the name Mrs. Mirjam Simmons. Her daughter's name remained Theodora Carton. The parties subsequently had a child David Simmons.

Further testimony from Ms. Simmons included allegations that Donald Simmons had agreed to adopt Theodora, in order to permit her to become a United States citizen. The adoption did not take place, though she testified that the issue arose every couple of years when questions concerning the name difference arose. In one instance, Ms. Simmons changed the name on a copy of the birth certificate so as to make it appear that Theodora's last name was Simmons. (3/3/92 N.T. 22)

Until the parties separated in 1987, they lived together as a family unit consisting of the parties and the two children, Theodora and David. In 1987, Theodora was a student at American University, for which Donald Simmons had paid at least two years of tuition. (3/3/92 N.T. 108). [Footnote] Ms. Simmons agreed that during Theodora's first 18 years Donald Simmons provided the primary support for the family. (3/3/92 N.T. 107)

Upon Theodora's death, a death certificate was issued in which Donald L. Simmons' name appears as father and Mirjam Simmons as the informant. Ms. Simmons testified that the information was not given by her, but by an attorney acting on behalf of both her and Donald Simmons. Thereafter, an amended certificate of death was issued at

her request eliminating the name of Donald L. Simmons as the father. (Exhibit P–3 and P–4)

From further testimony by the mother and Donald Simmons, it has become apparent that he was reluctant and withheld proceeding to an adoption. He testified that he saw no reason to do so in view of the fact that he was Theodora's father. We conclude from an examination of the testimony of both parties that the name of a father would not appear on a birth certificate issued in the Netherlands, unless he was married to the mother. This accounts for the designation of Ms. Simmons' father as a guardian for the child born out of wedlock.

Mr. Simmons' testimony was that upon the mother's return from her stay in England in December of 1963, the parties continued to 'live together' through early 1964 up to the time that the child was born. He testified that although he had a small room in a friend's apartment, the mother was living a short distance away and that, for all intents and purposes, he was sharing her apartment with her. This includes the significant period of time when conception would have occurred, during which period Ms. Simmons says she 'may have' seen Donald in the neighborhood. This is clearly not significant evidence of non-access.

On cross-examination, Ms. Simmons acknowledged that the relationship had started a couple of years prior to the conception of the child; that soon after Theodora was born the parties continued to live together. Ultimately, the mother brought the child to the United States, the parties were married to one another and for twenty years Donald Simmons treated Theodora as one of his children. It was not refuted that he supported her, including a substantial period of time when Ms. Simmons did not work outside the home. He continued to support Theodora for two or three years that she was in college up to the time that he left the marital home.

Further, on cross-examination, Ms. Simmons acknowledged that she never once said to Mr. Simmons that some other person was Theodora's father. (N.T. 103, 1. 9 et seq.)

Although Simmons acknowledged that he did not see the birth certificate, it is apparent that he knew that his name did not appear as the father. This explains the need for a 'change of name' in order to establish citizenship for Theodora. This was established by the attorney and longtime friend of the parties who testified to discussions with Ms. Simmons with regard to accomplishing the appropriate correction of documents for application for Theodora's citizenship.

The death certificate and obituaries were supplied from information given at a time when Donald Simmons was not available by reason of his separation from Ms. Simmons and the fact that he was then living in St. Croix. These documents referred to Donald Simmons as Theodora's father. It was only after this litigation that through counsel, Ms. Simmons arranged to have the death certificate amended deleting the reference to Donald Simmons as Theodora's father.

---

[Footnote] He claims to have paid the third year's tuition as well.

Trial court opinion, 6/18/93 at 3–7.

Letters of administration were first issued to Mirjam several days after the death of Dory. A short time later, Donald was added as a co-administrator. Upon learning that a co-administrator had been appointed, Mirjam petitioned the Register of Wills to remove Donald on the basis that he was not the father of Dory, and therefore not entitled to administer the estate. The Register of Wills conducted two days of hearings on March 3, 1992, and April 3, 1992. On September 11, 1992, an opinion was issued by the Register of Wills revoking the letters of administration previously granted to Mirjam and Donald. On October 22, 1992, letters were issued solely to Mirjam. Donald appealed to the Orphans' Court Division of the Court of Common Pleas of Bucks County. The Orphans' Court determined that the extent of its review was limited to whether the Register of Wills had abused her discretion. After its review of the record made by the Register of Wills, the court found the Register had abused her

discretion and as a result was compelled to reverse and vacate the decision. The court reinstated the letters previously granted to Mirjam and Donald. This timely appeal taken by Mirjam Simmons–Carton followed.

Mirjam first contends that the Orphans' Court erred in reversing the decision of the Register of Wills. Mirjam's argument consists of two subparts. First, Mirjam claims that the Register of Wills has the exclusive authority and responsibility to issue letters of administration, and the scope of review of the Orphans' Court, on appeal, is limited strictly to the question of whether the Register abused her discretion. Second, Mirjam argues that the Register of Wills properly exercised judicial discretion in receiving the evidence and rendering an opinion rejecting the claim of Donald and appointing her, the mother of the decedent, as the sole administratrix of the estate.

■ In response to Mirjam's first sub-issue, we begin by setting out the jurisdiction of both the Orphans' Court and Register of Wills. Turning to Title 20, Decedents, Estates and Fiduciaries, of the Pennsylvania Consolidated Statutes Annotated, Section 711 governs the mandatory exercise of jurisdiction through Orphans' Court in general. It provides, in relevant part:

[T]he jurisdiction of the court of common pleas over the following shall be exercised through its orphans' court division:

. . . .

(12) Fiduciaries. The appointment, control, settlement of the accounts of, removal and discharge of, and allowance to and allocation of compensation among, all fiduciaries of estates and trusts, jurisdiction of which is exercised through the orphans' court division, except that the register shall continue to grant letters testamentary and of administration to personal representatives as heretofore.

20 Pa.C.S.A. § 711(12).

Section 901 sets out the jurisdiction for the Register of Wills.

Within the county for which he has been elected or appointed, the register shall have jurisdiction of the probate of wills, the grant of letters to a personal representative, and any other matter provided by law.

20 Pa.C.S.A. § 901.

In *Estate of Osborne,* 363 Pa.Super. 200, 525 A.2d 788 (1987) (en banc), this court was called upon to determine whether the Orphans' Court Division may direct the Register of Wills to issue letters of administration to an individual selected by the Orphans' Court. The appellant claimed that the selection of a proper administrator is within the exclusive jurisdiction of the Register of Wills. A thorough review of the relevant statutes and procedures was undertaken by this court. The *Osborne* court concluded that while the original selection of an administrator is normally a task within the jurisdiction of the Register, it held that, upon a finding by the Orphans' Court that the Register has abused its discretion in the selection of the original administrator, the Orphans' Court may review the evidence presented, revoke the letters, and direct the Register to issue letters to the individual whom the court finds to be entitled to administer the estate. *Id.* at 207, 525 A.2d at 792.

Applying the reasoning of *Osborne* to the case *sub judice,* we find that while the Register indeed has the task of appointing administrators, once the decision is appealed to the Orphans' Court it is for that court to determine if an abuse of discretion has taken place. Furthermore, once the court has determined that an abuse of discretion has occurred, the court may direct the Register to issue letters to the individual whom the court finds is entitled. *See* 20 Pa.C.S.A. § 3183.[1]

---

1. The procedure for and effect of removal is found at Section 3183. This section authorizes the Orphans' Court to consider revocation *sua sponte* of letters of administration previously granted by the register.

   **§ 3183. Procedure for and effect of removal**

   The court on its own motion may, and on the petition of any party in interest alleging adequate grounds for removal shall, order the personal representative to appear and show cause why he should not be removed, or, when necessary to protect the rights of creditors or parties in interest, may summarily remove him. Upon removal, the court may direct the grant of new letters testamentary or of administration by the register to the person entitled and may, by summary

■ We recognize that *Osborne* differs factually from the matter presently before us. Instantly, the Orphans' Court directed the Register to reinstate Donald as a co-administrator of the estate. In *Osborne*, the Orphans' Court directed the Register to revoke a previous grant of letters of administration and to issue letters to another party. We believe this is a factual distinction without a difference. Both cases demonstrate that once the Orphans' Court is requested to review a Register's decision concerning the grant of letters of administration, upon a finding of an abuse of discretion, the Orphans' Court may take the necessary steps to correct the matter. Those steps may include reinstatement, removal, or the addition of a new party.

Mirjam's second sub-issue contends that the Register of Wills properly exercised her judicial discretion; hence, her decision should not have been reversed and vacated by the Orphans' Court. Mirjam argues that her testimony, as the natural mother, was properly given strong probative value by the Register of Wills. Mirjam cites to *Estate of Owen S. Hoffman*, 320 Pa.Super. 113, 466 A.2d 1087 (1983), in support of her position. As discussed below, we believe Mirjam's reliance on *Hoffman* is misplaced.

The facts of *Hoffman*, briefly stated, reveal that Ruth H. DeLong, the appellant in *Hoffman*, shortly after her birth in 1927 was taken to the home of her mother's sister, Mary Hoffman, and Mary's Husband, Sidney S. Hoffman. Ruth was raised by Mary and Sidney and lived with them until her marriage in 1946. However, around the time Ruth was twelve or thirteen, she learned by accident that her "Aunt" Marian Mentch was in fact her natural mother. Ruth was never adopted by Mary or Sidney. Sidney died in 1953 and Mary

attachment of the person or other appropriate orders, provide for the security and delivery of the assets of the estate, together with all books, accounts and papers relating thereto. Any personal representative summarily removed under the provisions of this section may apply, by petition, to have the decree of removal vacated and to be reinstated, and if the court shall vacate the decree of removal and reinstate him, it shall thereupon make any orders which may be appropriate to accomplish the reinstatement.

died in 1972. In 1978 Owen Hoffman, Sidney's brother died. Owen, whose wife had predeceased him, died without leaving issue. Ruth claimed to be the *natural* daughter of Sidney S. Hoffman, in an attempt to claim entitlement to one-half of Owen Hoffman's residuary estate. The trial court found that the claim of Ruth DeLong had not been sustained by clear and convincing evidence. The trial court stated:

'The record merely indicates that Sidney and Mary took their illegitimate niece into their home to raise as their own child. There were no facts tending to support claimant's allegation that Sidney was her natural father. All of the evidence presented in this case is consistent with the fact that Mary and Sidney were raising claimant as their foster child.'

*Id.* at 118–19, 466 A.2d at 1090. This court observed "that claims of paternity made after the lips of the alleged father have been sealed by death are in that class of claims which must be subjected to the closest scrutiny and which can be allowed only on strict proof so that injustice will not be done." *Id.* at 117, 466 A.2d at 1089. We noted that while Ruth DeLong presented competent evidence to show the existence of a close relationship between herself and Sidney Hoffman, her failure to call her natural mother, who was available, to testify diluted her case. We stated:

Thus the failure of a party, without explanation, to call as a witness her own mother to testify to the identity of that party's father permits an inference by the fact finder that the mother's testimony would have been unfavorable to the claimant who had the burden of proving the paternity necessary to substantiate her claim.

*Id.* at 119, 466 A.2d at 1091.

We believe the *Hoffman* case does not stand for the proposition that a mother's testimony conclusively establishes paternity. Based on the factual setting in *Hoffman*, it was the absence of the natural mother's testimony which cast doubt on Ruth DeLong's claim. Thus, she failed to sustain her burden of proving that she was testator's niece.

■ Mirjam's next claim raises a unique question which concerns the intestacy provisions of 20 Pa.C.S.A. § 2107. She argues that Donald relied primarily on 20 Pa.C.S.A. § 2107 and that that statute is not intended to prove paternity or to allow inheritance by estoppel.[2]

Section 2107 provides as follows:

**Section 2107.  Persons born out of wedlock**

(a) Child of mother.—For purposes of descent by, from and through a person born out of wedlock, he shall be considered the child of his mother.

. . . .

(c) Child of father.—For purposes of descent by, from and through a person born out of wedlock, he shall be considered the child of his father when the identity of the father has been determined in any one of the following ways:

(1) If the parents of a child born our [sic] of wedlock shall have married each other.

(2) If during the lifetime of the child, the father openly holds out the child to be his and receives the child into his home, or openly holds the child out to be his and provides support for the child which shall be determined by clear and convincing evidence.

(3) If there is clear and convincing evidence that the man was the father of the child, which may include a prior court determination of paternity.

**2.** Mirjam posits that to allow for inheritance by estoppel would establish step-fathers as a new class of beneficiaries under the Intestate Act. We note that Donald does not claim to be Dory's step-father. Rather, he asserts that Dory was a child born out of wedlock who was fathered by him. Under the intestate act there are specific statutory heirs designated for inheritance purposes. With the exception of surviving spouses and adopted children, only those heirs in some degree of consanguinity may inherit. The clear legislative purpose of § 2107(c) is to provide a means by which children born out of wedlock and those who seek to inherit from or through them can legally establish the requisite degree of consanguinity where paternity is a relevant fact. In the case of a "step-father," by definition, paternity is not a relevant fact. Therefore, Mirjam's fears regarding the designation of "step-fathers" as a new class of beneficiaries are misplaced.

Mirjam claims Donald Simmons should not be permitted to establish his paternity by using this statute as the statute was intended as a method to allow inheritance by an illegitimate child and to provide means for the proof of the acknowledgement of that paternity in the father after the lips of the father have been sealed. However, Mirjam fails to consider that the statute allows for a determination of intestate descent *by*, *from*, and *through* the child born out of wedlock.

We see no reason why Donald should not be permitted to rely on this statute. Donald testified in accordance with subsection (c)(2) that from the time of Dory's birth, he believed himself to be her father. While Mirjam disputes Donald's testimony that he lived with her for a time before the birth, was present at the birth, and subsequently returned to the United States with the promise that he would end the marriage he was in at the time, certain facts are undisputed. Those undisputed facts reveal that Donald did return to the United States and divorced his wife. Mirjam and Dory came to the United States in the fall of 1966. Soon after their arrival, Mirjam and Donald were married. They lived together until 1987 at which time Donald left the marital residence. Mirjam admits that even though Dory was a Dutch citizen with her maiden name on her birth certificate, she was known at school and in their neighborhood as Dory Simmons. Mirjam also testified that throughout the marriage which spanned 21 years she never mentioned that Donald was not Dory's father. Donald contends that he has always considered himself the father of Dory, always provided a home and support for her, and was unaware of any other man that had access to Mirjam at the time Dory was conceived. This evidence meets the criteria of § 2107 for determining whether a child born out of wedlock will be considered the child of the father for purposes of descent.

While Donald does rely on § 2107, he also refers us to the text of **23 Pa.C.S.A. § 5102, Children declared to be legitimate.** He points out, in particular, that the wording of subsection (b)(1), (2) and (3) of § 5102 is substantially the

same as the text of 20 Pa.C.S.A. § 2107(c)(1), (2) and (3). Section 5102 states: . .

### § 5102. Children declared to be legitimate

(a) General rule.—All children shall be legitimate irrespective of the marital status of their parents, and, in every case where children are born out of wedlock, they shall enjoy all the rights and privileges as if they had been born during the wedlock of their parents except as otherwise provided in Title 20 (relating to decedents, estates and fiduciaries).

(b) Determination of paternity.—For purposes of prescribing benefits to children born out of wedlock by, from and through the father, paternity shall be determined by any one of the following ways:

(1) If the parents of a child born out of wedlock shall have married each other.

(2) If, during the lifetime of the child, it is determined by clear and convincing evidence that the father openly holds out the child to be his and either receives the child into his home or provides support for the child.

(3) If there is clear and convincing evidence that the man was the father of the child, which may include a prior court determination of paternity.

We note that 20 Pa.C.S.A. § 2107 is cross referenced after the above statute along with the notation "Legitimation by marriage of parents." The above statutory language, when applied to the facts of this case, indicates that Donald certainly would be held to be Dory's father for purposes of a determination of paternity. As the child of Donald, Dory would be able to inherit from him. It follows that Donald should be able to inherit from Dory under the intestacy provisions of § 2107.

In her second argument, Mirjam asserts that the Orphans' Court erred in applying a theory of equitable estoppel to reject her testimony which controverted the testimony of Donald that he was the father of the decedent and thus entitled to inherit under the intestate laws of Pennsylvania.

■ In *Curran v. Eberharter,* 361 Pa.Super. 65, 521 A.2d 474, *appeal denied,* 515 Pa. 613, 530 A.2d 867 (1987), we defined the doctrine of equitable estoppel.

'Equitable estoppel arises when a party by acts or representation intentionally or through culpable negligence, induces another to believe that certain facts exist and the other justifiably relies and acts upon such belief, so that the latter will be prejudiced if the former is permitted to deny the existence of such facts.'

*Id.,* 361 Pa.Super. at 74, 521 A.2d at 479–480, *quoting Straup v. Times Herald,* 283 Pa.Super. 58, 71, 423 A.2d 713, 714 (1980). In simplistic terms, the doctrine is one of fundamental fairness such that it prevents a party from taking a position that is inconsistent to a position previously taken and thus disadvantageous to the other party.

■ Mirjam's claim that the application of estoppel in this situation abrogates the application of the burden of proof requirements is without merit. Donald must prove by clear and convincing evidence that during the lifetime of the child he openly held out the child as his and received the child into his home, or held the child out as his and provided support. See 20 Pa.C.S.A. § 2107(c)(2). We believe, as did the trial court, that Donald has carried his burden.

■ Mirjam, after 21 years of marriage in which she held out her daughter Dory as the daughter of Donald, now refutes that claim. The only purpose served by her action is to eliminate her former husband from receiving a share of Dory's estate. We believe this is the type of situation to which the doctrine applies. Mirjam will not now be permitted to change her position.

Another line of cases has spoken on the subject of equitable estoppel in paternity cases. In the seminal case of *John M. v. Paula T.,* 524 Pa. 306, 571 A.2d 1380 (1990), *cert. denied,* 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990), our supreme court stated:

We see the Commonwealth/family interests highlighted by the 'estoppel' cases. In these cases, it is recognized that,

under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as father of the child. The classic example of this principle is where a man who has lived with a woman and her children for a number of years and has held himself to the world as the father of said children, may be estopped from seeking court-ordered blood tests in a belated attempt to deny paternity. *Commonwealth ex rel. Weston v. Weston*, 201 Pa.Super. 554, 193 A.2d 782 (1963), cited with approval in *Adoption of Young, supra* at 469 Pa. [141] at 148–49, 364 A.2d 1307 [ (1976) ]. These estoppel cases indicate that where the principle is operative, blood tests may well be *irrelevant*, for the law will not permit a person in these situations to challenge the status which he or she has previously accepted. *See, e.g., Commonwealth ex rel. Palchinski v. Palchinski*, 253 Pa.Super. 171, 384 A.2d 1285 (1978); *Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa.Super. 307, 369 A.2d 416 (1976).

The General Assembly has codified the principle of 'paternity by estoppel' in its act of June 17, 1971, P.L. 175, No. 17, § 1, *as amended* by Act of November 26, 1978, P.L. 1216, No. 288 § 1, 48 Pa.Stat.Ann. § 167 (Purdon's Supp.1989) (hereinafter referred to as 'section 167'), which provides:

**Children; legitimacy; determination of paternity**

. . . .

*See also* 20 Pa.C.S.A. § 2107(c)(2).

*Id.*, 524 Pa. at 318, 571 A.2d at 1386–87 (emphasis in original). We recognize that *John M., supra,* and its progeny address custody and visitation matters and that the instant matter is one of intestate succession. However, because the language at issue in § 2107 is the same language interpreted by *John M.* we cannot ignore those rulings.

In *In re Montenegro*, 365 Pa.Super. 98, 528 A.2d 1381 (1987), this court applied the doctrine of equitable estoppel to prevent a parent from questioning paternity. *Montenegro* involved a man who allowed his name to be designated on the

birth certificate as father of the child. He subsequently married the mother, thereafter living with the child in a family relationship, during which relationship a daughter was born. Five years after the marriage, Montenegro separated from his wife and questioned his paternity of the child in a support proceeding. This court, referencing 23 Pa.C.S.A. § 5102, held that when putative fathers hold themselves out to be the father of the child, by marrying the mother and assuming responsibility for the care of the child, paternity is thereby determined. Thus, the father was estopped from denying paternity.

In *Gulla v. Fitzpatrick*, 408 Pa.Super. 269, 596 A.2d 851 (1991), the natural mother, Fitzpatrick, informed Gulla that she was pregnant and he was the father of the child. Gulla proposed marriage which Fitzpatrick accepted. The parties planned to marry, but the wedding did not take place due to Fitzpatrick's vacillation. The baby was born and Gulla's name was placed on the birth certificate. Gulla paid Fitzpatrick's hospital bill as well as living expenses for Fitzpatrick and the baby. Gulla was involved in all aspects of the child's life and care. Several months after the birth of the baby, Fitzpatrick claimed Gulla was not the father. Despite this claim, Fitzpatrick filed a complaint for child support against Gulla. A support order was entered and Gulla willingly paid the required amount. A few months after the order was entered Fitzpatrick stopped cashing Gulla's checks as Gulla had filed a complaint for custody. The trial court ordered the parties and the child to submit to HLA blood testing. The blood tests conclusively excluded Gulla as the biological father of the child. Fitzpatrick then sought and received an *ex parte* order withdrawing the support complaint she had previously filed and vacating the support order entered. Both parties filed motions for summary judgment on the issue of custody/visitation. Fitzpatrick argued that Gulla had no right to custody or visitation because he was not the biological father. Gulla claimed that Fitzpatrick was both collaterally and equitably estopped from questioning his paternity, and that he had developed a constructive parental relationship with the child.

This court agreed with the trial court that this case properly called for the application of equitable estoppel to prevent Fitzpatrick from questioning the paternity of Gulla.

Recently, in *Jefferson v. Perry*, 432 Pa.Super. 651, 639 A.2d 830 (1994), this court stated "[P]rinciples of estoppel are peculiarly suited to cases where the child is conceived out of wedlock and no presumptions regarding paternity apply." At 656, 639 A.2d at 833. Clearly, the case before us is a classic example of a case where the doctrine of equitable estoppel should be applied.

Donald Simmons held himself out as the father of Dory and provided for her support. That Donald Simmons did that which he was required to do under the statute is uncontradicted, and in fact *admitted* by Mirjam. Mirjam, in her testimony before the Register of Wills, stated that throughout their marriage and until the time of Dory's untimely death, she never mentioned to Donald that he might not be the father of Dory. Dory was enrolled in school under the Simmons' name and held out to the community as Dory Simmons. Mirjam cannot now challenge Donald Simmons' paternity. Application of the doctrine of equitable estoppel aims at achieving fairness as between the parents by holding them, *both* mother and father, to their prior conduct regarding the paternity of the child. *Gulla, supra*, 408 Pa.Super. at 278, 596 A.2d at 856. Mirjam must be held to her actions during the course of the marriage and afterward up to the time of Dory's death. Thus, we find she is estopped from now denying Donald's paternity.

Order affirmed.