439 Pa. Superior Ct. 58 (1995)
653 A.2d 28
C.T.D., Appellee,
v.
N.E.E. and M.C.E., Appellants.
Superior Court of Pennsylvania.
Argued March 17, 1994.
Filed January 9, 1995.
*59 Thomas A. James, Jr., Bloomsburg, for appellants.
Robert W. Lape, Jr., Roaring Springs, for appellee.
Before WIEAND, DEL SOLE and HUDOCK, JJ.
DEL SOLE, Judge:
This appeal raises important issues regarding a putative father's right to request court ordered blood tests to determine paternity and the rights of the child's mother and the man who is named as the child's father on his birth certificate, to not undergo such testing.
N.E.E. gave birth to a son, B.T., on June 22, 1990 and at that time, chose not to name B.T.'s father. She testified that when B.T. was conceived, she was involved in sexual relationships with three men, M.C.E., C.T.D. and S.M. and while she believed that M.C.E. was B.T.'s biological father, she chose not to name him as such because their relationship was still developing.
N.E.E.'s relationship with M.C.E. continued throughout her pregnancy and she also remained in contact with C.T.D. He accompanied her to the doctor on a couple of occasions, and they exchanged several letters. In one of her letters to him, N.E.E. informed C.T.D. that it was her belief that either he or S.M. was the father of her baby, but that nothing could be determined for sure until the baby was born and blood tests were performed. M.C.E. was not mentioned in the letter. As her pregnancy progressed, contact between C.T.D. and N.E.E. lessened and eventually ceased following a phone conversation that occurred between them two days after B.T.'s birth. During that conversation, N.E.E. told C.T.D. that the baby *60 was a boy and that she was now with M.C.E. who had been at her side during B.T.'s birth.
After B.T. was born, the relationship between N.E.E. and M.C.E. continued. In June 1991, N.E.E. and B.T. moved in with M.C.E. and his parents and within a few months, M.C.E., N.E.E. and B.T. moved into a home of their own. On December 31, 1991, M.C.E. and N.E.E. married and on March 5, 1992, a new birth certificate was issued for B.T. naming M.C.E. as his father.
On March 24, 1992, N.E.E. received a letter from an attorney representing C.T.D. and S.M. requesting that all parties involved submit to blood testing to determine the identity of B.T.'s biological father. N.E.E. refused to submit to the testing and on June 22, 1992, C.T.D. and S.M. filed a Complaint seeking partial custody and visitation of B.T. and a Petition for Blood Tests.[1] Acting upon an agreement that was purportedly entered into between N.E.E., C.T.D. and S.M., the court entered a Consent Order directing that the parties submit to blood tests. Subsequently, N.E.E. filed a Motion for a Protective Order challenging the veracity of the Consent Order on the grounds that it was improperly granted because N.E.E.'s attorney acted without authority to enter into it on N.E.E.'s behalf and that it was improperly granted without M.C.E.'s joinder and consent. The court granted the Protective Order and an evidentiary hearing was held for the purposes of taking testimony relating to the petition for blood tests. After hearing testimony from the parties, the trial court ordered the tests and this appeal followed.[2]
N.E.E. and M.C.E. argue that the trial court erred in ordering the blood tests. They allege that C.T.D. was estopped from requesting the tests because his petition was not filed until B.T. was almost two years old. They argue that in the interim they established a family unit and Appellee failed *61 to claim or establish any parental right to B.T. during that time.
Subsection "c" to the Uniform Act on Blood Tests to Determine Paternity, 23 Pa.C.S.A. § 5104 provides as follows:
(c) Authority for test.  In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.
23 Pa.C.S.A. § 5104(c).
This court has held that "[w]hile the Act creates a statutory right to obtain blood testing to determine paternity, the right is not absolute and must be balanced against competing societal/family interests." McCue v. McCue, 413 Pa.Super. 71, 74, 604 A.2d 738, 739 (1992), allocatur denied, 531 Pa. 655, 613 A.2d 560 (1992) citing Donnelly v. Lindenmuth, 409 Pa.Super. 341, 344, 597 A.2d 1234, 1235 (1991). N.E.E. and M.C.E. argue that C.T.D.'s alleged right to the testing is far outweighed by the fact that they have established a family and that C.T.D. has failed to develop any relationship with B.T. In particular, N.E.E. and M.C.E. rely on 23 Pa.C.S.A. § 5102(b) for the proposition that paternity by estoppel bars C.T.D. from seeking and obtaining the requested testing. It reads as follows:
(b) Determination of paternity.  For purposes of prescribing benefits to children born out of wedlock by, from and through the father, paternity shall be determined by any one of the following ways:
(1) If the parents of a child born out wedlock have married each other.

*62 (2) If, during the lifetime of the child, it is determined by clear and convincing evidence that the father openly holds out the child to be his and either receives the child into his home or provides support for the child.
(3) If there is clear and convincing evidence that the man was the father of the child, which may include a prior court determination of paternity.
23 Pa.C.S.A. § 5102(b).
Because N.E.E. and M.C.E. married after B.T.'s birth, there is no presumption that M.C.E. is B.T.'s biological father. See Everett v. Anglemeyer, 425 Pa.Super. 587, 625 A.2d 1252 (1993) and John M. v. Paula T., 524 Pa. 306, 571 A.2d 1380 (1990) cert. denied, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990) (presumption exists that a child is a child of the marriage where the child is born to a married woman). Recognizing that that presumption does not apply to this case, N.E.E. and M.C.E. argue instead that this case should be determined according to the doctrine of paternity by estoppel.
"[P]rinciples of estoppel are peculiarly suited to cases where the child is conceived out of wedlock and no presumptions of paternity apply." Jefferson v. Perry, 432 Pa.Super. 651, 656, 639 A.2d 830, 833 (1994). "In simplistic terms, the doctrine [of equitable estoppel upon which paternity by estoppel is based] is one of fundamental fairness such that it prevents a party from taking a position that is inconsistent to a position previously taken and thus disadvantageous to the other party." In re Estate of Simmons-Carton, 434 Pa.Super. 641, 654, 644 A.2d 791, 798 (1994). Paternity by estoppel has been used to prevent an individual who has held himself out to be a child's father from later seeking blood testing in an effort to prove that he is not the child's father. In the Matter of Michael Ronald Montenegro, Jr., 365 Pa.Super. 98, 528 A.2d 1381 (1987). Likewise, the doctrine has also been used to prevent a child's natural mother from successfully seeking blood testing where her objective was to disprove the paternity of the man she previously acknowledged to be the child's father. McCue v. McCue, supra, 413 Pa.Super. 71; Gulla v. Fitzpatrick, 408 *63 Pa.Super. 269, 596 A.2d 851 (1991) and Seger v. Seger, 377 Pa.Super 391, 547 A.2d 424 (1988).
In the present case, C.T.D. is not seeking to deny that he is B.T.'s father, but rather he wants to establish that he is his father. N.E.E. and M.C.E. argue that under the doctrine of paternity by estoppel, factors such as their marriage, B.T.'s new birth certificate and the fact that M.C.E. has continually held B.T. out as his son, effectively estop C.T.D. from asserting his paternity. We disagree. Paternity by estoppel as discussed above, applies to those situations where "blood tests may well be irrelevant, for the law will not permit a person in [those] situations to challenge the status which he or she has previously accepted." John M. v. Paula T., 524 Pa. 306, 318, 571 A.2d 1380, 1386-87 (1990) cert. denied, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990). While it is clear that paternity by estoppel could be applied to preclude either M.C.E. or N.E.E. from challenging M.C.E.'s paternity, we find no support for the argument that their actions can estop C.T.D. from asserting his alleged paternity. Instead, we find that C.T.D.'s failure to act during B.T.'s first two years of life may have effectively estopped him from now raising his claim of paternity.
From 1990 until 1992, C.T.D. had no contact with either mother or child. By his own account, he made no attempt to establish a relationship with B.T. or offer him any financial support. Under these circumstances, we hold that a determination of whether C.T.D. abandoned B.T. is crucial to the disposition of this case. As we have recognized in the Adoption Act, a parent's rights to a child may be terminated after six months if the court finds that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition [for involuntary termination of parental rights] either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1). By analogy, in a case as the one presented here, the trial court should determine if the putative father has failed to timely exert his parental claim. Part of that determination *64 should examine whether N.E.E. and M.C.E. by their actions frustrated C.T.D.'s ability to seek custody or visitation. If there is no evidence that N.E.E. and M.C.E. prevented C.T.D. from visiting the child or that C.T.D. made any attempt to establish paternity for two years, the request for blood tests should be denied. The dissenting author claims that in reaching our decision we have "failed to give adequate consideration to C.T.D.'s right to share in the support and companionship of a child who may be his own." This criticism is unfounded. We have carefully considered C.T.D.'s rights but we believe that he may have relinquished those rights through his actions. Being a parent is more than a biological function. It requires a commitment to the child which is many times demanding. Therefore, if the court finds that C.T.D. has failed to exercise his parental claim, there is no reason to disturb the familial relationship that has developed between B.T., N.E.E. and M.C.E.
Accordingly, we find it necessary to remand this matter to the trial court for a determination of whether C.T.D.'s actions amounted to an abandonment of his potential paternal responsibilities to the degree that he allowed an uncontested father-child relationship to develop between M.C.E. and B.T. If the trial court finds that C.T.D. abandoned B.T., C.T.D.'s request for blood testing should be denied.
Order reversed and case remanded to the trial court for proceedings consistent with this Opinion. Jurisdiction relinquished.
WIEAND, J., files a dissenting opinion.
WIEAND, Judge, dissenting:
I respectfully dissent. There is in this appeal no need to remand for further proceedings. The circumstances which led the trial court to order blood tests to aid it in determining paternity were fully presented by the parties, and there is no need for an additional evidentiary hearing to explore further the issue of estoppel. Indeed, appellants have not requested remand for an evidentiary hearing, and their argument on *65 appeal, as I understand it, is that, in order to preserve a subsequently created family, we should recognize another exception to the legislatively authorized use of blood tests to determine true paternity. After careful review, I would refuse to create an additional exception under the circumstances of this case and would affirm the order of the learned trial court.
A son, B.T., was born to N.E.E. on June 22, 1990. During the possible period of conception, N.E.E. had engaged in sexual relations with three men, M.C.E., C.T.D., and S.M., any of which could have been the father of the child. Because of this uncertainty the child's birth certificate stated that his father was unknown. Sometime before the child was born, however, a steady relationship developed between the child's mother and M.C.E., who thereafter participated in prenatal care and was present at the birth of B.T. In June, 1991, N.E.E. and M.C.E. began living together, and, on December 31, 1991, they were married. N.E.E. thereupon took her husband's last name, and, in March, 1992, husband and, wife had B.T.'s birth certificate amended to reflect that M.C.E. was his father and that the child was to be known by M.C.E.'s last name. Subsequently, a daughter was also born of the marriage of N.E.E. and M.C.E.
Shortly after learning that she was pregnant with B.T., N.E.E. had sent a letter to C.T.D. stating that either he or S.M. was the father of the child.[1] Subsequently, C.T.D. wrote several letters to N.E.E., which she answered. Following the birth of B.T., C.T.D. called N.E.E. by telephone, and during this conversation N.E.E. told C.T.D. of her relationship with M.C.E. There was no further contact between N.E.E. and C.T.D. until March 24, 1992, when N.E.E. received a letter from a lawyer purporting to represent C.T.D. and S.M. and requesting that all parties submit to blood tests to establish the paternity of B.T. N.E.E. and M.C.E. refused to undergo such testing.
*66 On June 22, 1992, C.T.D. filed a complaint seeking partial custody or visitation with the child, B.T.[2] Two days later, a petition for blood tests was filed. Pursuant thereto, counsel for the parties agreed that a consent order should be entered directing that such tests be made, and an order directing blood tests was entered. Subsequently, however, N.E.E. employed other counsel, who moved to set aside the prior order on grounds that counsel had lacked authority to agree to it. M.C.E. was now also joined as a party to the action. Following a hearing, the trial court directed the parties to submit to blood tests. N.E.E. and M.C.E. appealed from this order.[3]
The right to obtain blood testing to determine paternity is provided by the Uniform Act on Blood Tests to Determine Paternity, 23 Pa.C.S. § 5104. The Act provides, in part, as follows:
(c) Authority for test.  In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.
23 Pa.C.S. § 5104(c).
"There is no situation of more monumental importance, or more worthy of due process protection, than the creation of a parent-child relationship." Corra v. Coll, 305 Pa.Super. 179, 193-194, 451 A.2d 480, 488 (1982). "`While the Act creates a statutory right to obtain blood testing to determine paternity, the right is not absolute and must be balanced against competing societal/family interests.'" McCue v. McCue, 413 Pa.Super. *67 71, 74, 604 A.2d 738, 739 (1992), allocatur denied, 531 Pa. 655, 613 A.2d 560 (1992), quoting Donnelly v. Lindenmuth, 409 Pa.Super. 341, 597 A.2d 1234 (1991). A child has a right to know and be supported, financially and emotionally, by his or her biological father. See: Mastromatteo v. Harkins, 419 Pa.Super. 329, 336, 615 A.2d 390, 394 (1992), allocatur denied, 535 Pa. 648, 633 A.2d 152 (1993); Koleski v. Park, 363 Pa.Super. 22, 30, 525 A.2d 405, 408 (1987). Moreover, a parent's "right to `the companionship, care, custody and management of his or her children' is an important and legally protectible interest." Koleski v. Park, supra at 29, 525 A.2d at 408, quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972). See also: Lassiter v. Department of Social Services of Durham County, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). It is also clear, however, that the Commonwealth has an interest in promoting and preserving the stability of an intact family. See: Everett v. Anglemeyer, 425 Pa.Super. 587, 594, 625 A.2d 1252, 1256 (1993); Coco v. Vandergrift, 416 Pa.Super. 444, 448, 611 A.2d 299, 301 (1992).
In John M. v. Paula T., 524 Pa. 306, 571 A.2d 1380 (1990), cert. denied, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990), the Supreme Court of Pennsylvania held that a third party who stands outside a marital relationship will not be permitted to challenge a husband's claim of parentage by requesting blood tests under the Act. In such cases, the Court said, the presumption that the child is the issue of the husband is irrebuttable and conclusive and cannot be rebutted by the results of blood tests. In a concurring opinion by Nix, C.J., joined by a majority of the members of the court, he wrote: "Whatever the interests the putative father may claim, they pale in comparison to the overriding interests of the presumed father, the marital institution and the interests of this Commonwealth in the family unit." Id. at 322-323, 571 A.2d at 1388.
The decision in John M. v. Paula T., supra, is not on all fours with the instant case. Here, there is no presumption that M.C.E. is the biological father of B.T., for B.T. was not *68 born during coverture. M.C.E. and N.E.E. were not married until after the child had been born.
This also is not a case in which C.T.D. is estopped from asserting paternity. Estoppel is aimed at "achieving fairness between the parents by holding them both to their prior conduct regarding the paternity of the child." Jefferson v. Perry, 432 Pa.Super. 651, 656, 639 A.2d 830, 833 (1994). Thus, in Matter of Montenegro, 365 Pa.Super. 98, 528 A.2d 1381 (1987), a proceeding to amend the name of the father appearing on a child's birth certificate, the Superior Court held that after a father had been designated on the child's birth certificate, had married the child's mother and had lived with the child in a family relationship for five years, he was estopped from relying on blood tests to disprove paternity. See also: Wachter v. Ascero, 379 Pa.Super. 618, 550 A.2d 1019 (1988); Manze v. Manze, 362 Pa.Super. 153, 523 A.2d 821 (1987). Similarly, it has been held, a mother will be estopped from attempting to disprove the paternity of a man whom she has held out to be the father of her child. See: Gulla v. Fitzpatrick, 408 Pa.Super. 269, 596 A.2d 851 (1991); Christianson v. Ely, 390 Pa.Super. 398, 568 A.2d 961 (1990); Seger v. Seger, 377 Pa.Super. 391, 547 A.2d 424 (1988). See also: Adoption of Young, 469 Pa. 141, 364 A.2d 1307 (1976); In re Estate of Simmons-Carton, 434 Pa.Super. 641, 644 A.2d 791 (1994).
In the instant case, it may well be that M.C.E. would be estopped from denying paternity of B.T. in an action for B.T.'s support and that N.E.E. would also be estopped from denying M.C.E.'s paternity. However, M.C.E. and N.E.E., by their conduct, cannot cause C.T.D. to be estopped from asserting his alleged paternity. C.T.D. has not taken action or acquiesced in action that is inconsistent with his claim of paternity; and, therefore, he cannot be deemed estopped from asserting his own paternity by the conduct of those whose interest it is to assert otherwise.
In its desire to prevent C.T.D. from challenging N.E.E.'s paternity of B.T., the majority has failed to give adequate consideration to C.T.D.'s right to share in the support and companionship of a child who may be his own. This, as we *69 have observed, the courts have held to be an important and legally protected interest. Indeed, the Supreme Court of the United States has stated that "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause." Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614, 626 (1983) (citation omitted). Moreover, while B.T. may presently know M.C.E. as his father, he has a right to learn, at an appropriate time, the identity of his biological father. He may also have pecuniary interests, such as rights of support and inheritance which can be enforced if his true father is determined.[4]
The legislature has established that an "action or proceeding. . . to establish the paternity of a child born out of wedlock [for support purposes] must be commenced within 18 years of the date of birth of the child." 23 Pa.C.S. § 4343. In view of this policy, which has been established by the legislature, I cannot accept the majority's proposition that the biological father of a child born to an unmarried woman can be estopped from asserting paternity merely by failing to act for a period of less than two years. Such a holding, in my judgment, violates fundamental notions of fairness.
Several days after B.T. was born, C.T.D. called N.E.E. to inquire about the child. The two people spoke briefly about B.T.; but N.E.E. told C.T.D. that she "had found somebody else." N.E.E. subsequently began living with M.C.E., and the two were later married. Under these circumstances, I find it especially difficult to believe that C.T.D. should have acted more quickly and can now be estopped from determining, by blood testing, whether he is the biological father of the child born to N.E.E.
The legislature, when it enacted the Uniform Act on Blood Tests to Determine Paternity, established a clear policy for Pennsylvania. That policy was to sanction the use of blood *70 tests in any proceeding in which the paternity of a child was a relevant fact. 23 Pa.C.S. § 5104(c). In the absence of a policy decision of the Supreme Court to the contrary, the policy established by the statute is determinative. This policy clearly authorizes a trial court to order blood tests where, as here, paternity is a relevant fact. The majority cites no authority, and indeed there is none under the present state of the law, which would preclude the use of blood tests under the facts of this case.[5]
My review leads me to conclude that the trial court, acting pursuant to and in agreement with legislative authority, properly ordered blood tests to assist in determining whether C.T.D. is the biological father of B.T. When it did so, the court did not abuse its discretion. Therefore, I would affirm. Inasmuch as the majority concludes otherwise, I respectfully dissent.
NOTES
[1] S.M. was originally a party but he has since withdrawn.
[2] Orders directing that parties submit to blood tests for purposes of determining paternity are appealable. Jones v. Trojak, 535 Pa. 95, 634 A.2d 201 (1993).
[1] M.C.E. was not named in this letter as a possible father of the child.
[2] S.M. was also a party to this complaint, but he subsequently withdrew.
[3] The order is appealable. See: Jones v. Trojak, 535 Pa. 95, 634 A.2d 201 (1993).
[4] See: Koleski v. Park, 363 Pa.Super. 22, 30, 525 A.2d 405, 408 (1987).
[5] The majority's citation to 23 Pa.C.S. § 2511(a)(1) is not persuasive. This provision is not analogous to the present circumstances in which actual paternity is very much in doubt.