**T.E.B., Appellant**

v.

**C.A.B.**

v.

**P.D.K., Jr.**

Superior Court of Pennsylvania.

Submitted March 18, 2013.
Filed July 29, 2013.

Sheryl A. Safina–Pfarr, Johnstown, for appellant.

Carrie A. Bruce, Ashville, for C.A.B., appellee.

Joel D. Peppetti and Thomas K. Hooper, Duncansville, for P.D.K., appellee.

BEFORE: SHOGAN, J., OTT, J., and STRASSBURGER, J.*

OPINION BY STRASSBURGER, J.:

T.E.B. (Husband) appeals from the October 5, 2012 order which ordered that he have shared legal and physical custody of T.E.B., Jr. (Child) with C.A.B. (Mother) and P.D.K., Jr. (P.D.K.). Husband also appeals the December 2, 2009 order which allowed P.D.K. to intervene in the child custody matter. After careful review, we affirm.

_____

* Retired Senior Judge assigned to the Superior

The trial court summarized the underlying facts and procedural history as follows.

[Husband] and [Mother] married on August 29, 1992. [Husband] and Mother experienced marital difficulties in 2004. Around the same time, Mother began having a sexual relationship with a co-worker [P.D.K.].

In August of 2006, Mother became pregnant with the youngest of her four children. [Mother and Husband have three older daughters.] Mother immediately concluded that [P.D.K.] was the father of the [unborn] child. Mother knew [Husband] was not the father as he had undergone a vasectomy [which had not been reversed] and Mother and [Husband] were not intimate at the time of conception. Mother told [P.D.K.] that he was the child's father.

[Husband] was made aware that Mother was pregnant upon discovering that Mother was taking prenatal vitamins. When [Husband] confronted Mother, Mother advised [Husband] that she was pregnant with [P.D.K.]'s child. Mother testified that upon learning of the pregnancy, [Husband] coerced Mother into terminating contact with [P.D.K.,] stating to Mother that [Husband] "would do everything in his power, lie, whatever he had to do, to keep the girls and take the girls away from [Mother]."

[In May 2007], Mother gave birth to a son, [Child]. Two weeks after [Child's] birth [P.D.K.] ... accompanied Mother and [C]hild to a doctor's appointment. At that time [P.D.K.] informed Mother of his desire to be in [C]hild's life and his willingness to pursue legal recourse. Mother ... became upset and Mother and [P.D.K.] "parted ways."

Court.

[P.D.K.] hired an attorney who requested Mother and [Husband] agree to DNA testing[;] the requests were denied. On December 8, 2007, [P.D.K.] filed a Complaint for Partial Custody [hereafter Custody Complaint] against Mother. In response, preliminary objections were filed [by Husband] alleging Mother was "shocked" to have received the Custody Complaint "as she has asserted since the birth of [Child] that her husband, [Husband], is the natural father of said child." [4] On January 25, 2008, the preliminary objections were granted and the Custody Complaint was dismissed with prejudice. [P.D.K. did not pursue further legal action, fearing retaliation.]

---

[4] It is clear, from Mother and [Husband]'s testimony, that the allegations in the Preliminary Objections were false, as both Mother and [Husband] knew [P.D.K.] was the biological father of [Child].

[On July 29, 2008, Husband initiated the instant action by filing a Complaint for Custody seeking shared custody of Child and the couple's three daughters, although both of the parties continued to reside in the marital residence.] On April 2, 2009, after unsuccessful attempts at reconciliation, Mother filed for divorce. Mother and [P.D.K.] resumed their relationship sometime in the spring of 2009. In June of 2009 Mother and [P.D.K.] agreed to have a DNA test performed.

... On August 13, 2009, the Petition to Intervene in Custody Matter [hereafter Petition to Intervene] was filed on behalf of [P.D.K.]. On September 2, 2009, [Husband]'s Preliminary Objections to Petition to Intervene [hereafter Preliminary Objections to Petition] were filed ... seeking dismissal on the basis that [Child] was born into an intact family and thus the presumption of paternity barred the Petition to Intervene. Additionally, it was argued that dismissal of the Petition to Intervene was proper as [P.D.K.]'s Custody Complaint had been dismissed with prejudice.

On November 17, 2009 and November 19, 2009, the [trial c]ourt held an evidentiary hearing on the Petition to Intervene. Subsequently, on December 2, 2009, the [trial c]ourt entered an Order dismissing the Preliminary Objections and granting the Petition to Intervene. On January 4, 2010, [Husband] filed a Notice of Appeal of the [trial c]ourt's Order. By Order of the Superior Court dated March 10, 2010, the appeal was quashed as interlocutory.

On February 17, 2012, a custody hearing took place before [a Hearing Officer] and the Hearing Officer Summary was filed with the [c]ourt on March 8, 2012. The summary and attached proposed order referred to Mother and [P.D.K.] collectively as "Defendant" as the couple had been engaged and living together at the time of the hearing. The summary proposed that the parties have shared legal and physical custody of [Child, with Mother and P.D.K. Jointly exercising physical custody of Child each Sunday afternoon through Wednesday afternoon, as well as the last Friday and Saturday of each month; and with Husband enjoying physical custody of Child at all other times]. On March 21, 2012, Mother filed Defendant's Exceptions to Master's Report. On October 5, 2012, the [trial court] accepted the Hearing Officer's recommendations and issued an Opinion denying the exceptions. On October 30, 2012, [Husband] filed a Notice of Appeal.

Trial Court Opinion, 2/6/2012, at 1–4 (citations and some footnotes and quotations omitted). Both Husband and the trial court complied with Pa.R.A.P.1925.

Husband states three questions for this Court's consideration.

1. Whether it is in the best interests of [Child] to apply paternity by estoppel to bar [P.D.K. and Mother], from seeking to establish that P.D.K. is the biological father of the youngest child of four children born during the intact marriage of [Husband and Mother], who subsequently separated and divorced, held Husband out as the father of [Child] for over two (2) years and where P.D.K. substantially delayed filing his Petition to Intervene for nearly two (2) years, although he had knowledge prior to [C]hild's birth that he was, in all likelihood, the biological father, yet had little or no contact with [C]hild?

2. Absent fraud, did the [t]rial [c]ourt err and/or abuse its discretion, in admitting into evidence [P.D.K.]'s DNA test results of paternity, over [Husband]'s objections based upon the doctrine of paternity by estoppel?

3. Whether the [t]rial [c]ourt erred and/or abused its discretion by awarding shared legal custody and physical custody rights to ... P.D.K.?

Husband's Brief at 2 (suggested answers omitted).

Although he states separate questions, all of Husband's arguments are based upon his claim that proper application of the doctrine of paternity by estoppel bars P.D.K. from asserting any parental claim to Child. Husband first argues that the doctrine precluded P.D.K. from intervening; and second, that it prohibited introduction of DNA test results. Husband's argument as to his third question is that the trial court erred and/or abused its discretion in including P.D.K. in the custody order "[b]ased upon the doctrine of paternity by estoppel...." *Id.* at 20. Therefore, we must only determine whether the trial court erred in its ruling as to the applicability of the doctrine in order to resolve all three of Husband's questions.[1]

Paternity by estoppel "is merely the legal determination that because of a person's conduct (*e.g.,* holding the child out as his own or supporting the child), that person, regardless of his true biological status, will not be permitted to deny parentage...." *B.K.B. v. J.G.K.,* 954 A.2d 630, 634 (Pa.Super.2008). "[T]he law will not permit a person in these situations to challenge the status that he or she has previously accepted." *Id.* at 635 (citing *John M. v. Paula T.,* 524 Pa. 306, 571 A.2d 1380, 1386 (1990)). The doctrine of paternity by estoppel seeks to protect the interests of the child.

> Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he had known all his life is not in fact his father.

*Vargo,* 940 A.2d at 464 (quoting *Fish v. Behers,* 559 Pa. 523, 741 A.2d 721, 724 (1999)). Indeed, our Supreme Court recently considered the continuing applicability of the doctrine and held that it is the interests of the child that are paramount: "paternity by estoppel continues to pertain in Pennsylvania, but it will apply only where it can be shown, on a developed record, that it is in the best interests of the

---

1. We note that our standard of review of both paternity and custody determinations is that of an abuse of discretion. *See Vargo v.* *Schwartz,* 940 A.2d 459, 462 (Pa.Super.2007); *C.R.F. v. S.E.F.,* 45 A.3d 441, 443 (Pa.Super.2012).

involved child." *K.E.M. v. P.C.S.*, 614 Pa. 508, 38 A.3d 798, 810 (2012). The Court noted that if there is no difference in the supportive relationship available from the "psychological" and biological fathers, "we conclude that the responsibility for fatherhood should lie with the biological father." *Id.*[2]

The doctrine has most usually been applied either to (1) preclude a man who had held a child out as his own from avoiding further support of the child after his relationship with the mother had ended, *see, e.g. J.C. v. J.S.*, 826 A.2d 1 (Pa.Super.2003); or (2) preclude a woman who had held one man out as her child's father from seeking support from another man later on, *see, e.g., Fish v. Behers*, 559 Pa. 523, 741 A.2d 721 (1999). In other words, "those who mislead a child as to the identity of his or her natural father, cannot then turn around and disprove their own fiction to the detriment of the child." *Bahl v. Lambert Farms, Inc.*, 572 Pa. 675, 819 A.2d 534, 541 (2003).

Yet, estoppel also can serve to preclude a biological father from asserting his parental rights. This Court addressed the issue in *C.T.D. v. N.E.E.*, 439 Pa.Super. 58, 653 A.2d 28 (1995). In that case, the mother had sexual relations with several men, including C.T.D. and M.C.E., around the time her child was conceived. *Id.* at 29. The mother subsequently married M.C.E. (the husband), and the parties held the child out to be the husband's son. C.T.D. subsequently filed a petition for blood tests and a complaint seeking partial custody of the child. The mother and husband claimed that, based upon their marriage, naming the husband on the birth certificate, and continual holding out of the child as the husband's son, C.T.D. was precluded from asserting his paternity by the doctrine of paternity by estoppel. *Id.* at 31. This Court disagreed.

> Paternity by estoppel [provides that] the law will not permit a person to challenge the status which he or she has previously accepted. While it is clear that paternity by estoppel could be applied to preclude either [the husband] or [the mother] from challenging [the husband's] paternity, we find no support for the argument that their actions can estop C.T.D. from asserting his alleged paternity.

*Id.* (internal quotation and citation omitted). *See also Bahl*, 819 A.2d at 541 (declining to apply paternity by estoppel because "[w]here, as here, ... the putative parents who may have actively misled [the child] as to his parentage are not themselves challenging that fiction, our underlying policy concerns are simply not implicated.").

However, this Court held that although the actions of the mother and husband could not estop C.T.D. from alleging paternity, his own conduct, or lack thereof, could serve to estop his claim.

> [W]e find that C.T.D.'s failure to act during [the child's] first two years of life may have effectively estopped him from now raising his claim of paternity.
>
> From [the time the child was born in] 1990 until 1992, C.T.D. had no contact with either mother or child. By his own account, he made no attempt to establish any relationship with [the child] or offer him any financial support. Under these circumstances, we hold that a determi-

---

**2.** Justice Baer, Joined by Justice McCaffery, dissented in *K.E.M.*, opining that the doctrine of paternity by estoppel should be abrogated in its entirety, "with the limited exception of where its invocation would preserve the status of a husband who chooses to parent a non-biological child born into an existing marriage." 38 A.3d at 814 (Baer, J. dissenting).

nation of whether C.T.D. abandoned [the child] is crucial to the disposition of the case.... [I]n a case as the one presented here, the trial court should determine if the putative father has failed to timely exert his parental claim. Part of that determination should examine whether [the mother and husband] by their actions frustrated C.T.D.'s ability to seek custody or visitation.

*C.T.D.*, 653 A.2d at 31.

■ Thus, if a biological father is not obstructed from pursuing his parental claim and he acquiesces in the fiction that someone else is his child's father, the doctrine of estoppel may be invoked to bar his later attempt to assert his rights. *See also B.K.B.*, 954 A.2d at 636 (holding that the alleged biological father's failure to pursue parental rights for the first nine years of the child's life estopped him from challenging the former husband's status as the child's father); *In re M.J.S.*, 206 Pa.Super. 154, 903 A.2d 1, 10 (2006) (holding that the biological father was equitably estopped from asserting paternity and attacking the validity of an adoption decree, where he knew that another man had been named as the father and that he had a right to file an acknowledgment of paternity, yet he did nothing to assert paternity until three years after the child had been adopted); *Buccieri v. Campagna*, 889 A.2d 1220, 1228 (Pa.Super.2005) (holding that where the putative father was inactive for eight years, he was "estopped by his own past conduct from obtaining genetic tests to establish his paternity and/or assert his paternal rights").

In sum, the principles of law applicable to the instant case are as follows. The doctrine of paternity by estoppel seeks to achieve fairness by holding parties to their past representations, and to allow children to be secure in their parental relationships. Although the continuing value of the doctrine in the modern era has been called into question,[3] it continues to be viable in Pennsylvania Jurisprudence, but only if its application would serve the best interests of Child. The prior conduct of Mother and Husband cannot serve to estop P.D.K., but the fiction they have presented to Child obviously is relevant to the Child's-best-interests analysis. Failure to have acted promptly may estop P.D.K. from pursuing his claim, but not if the actions of Husband and Mother excuse his delay.

Hence, in deciding whether the doctrine of paternity by estoppel was applicable in the instant case, the trial court was presented with the extremely difficult task of synthesizing all of the above equitable and legal principles, applying them to the unique facts of this case, and fashioning a custody order that is both feasible for all of the interested parties and serves the best interests of Child in light of the factors enumerated in 23 Pa.C.S. § 5328(a) (including, *inter alia*, the child's need for stability; sibling relationships; which party is more likely to attend to the child's physical, emotional, and educational needs; child care arrangements; availability of extended family; and which party is more likely to encourage and permit contact between the child and the other party).

Before we turn to Husband's arguments that the trial court failed to apply the above principles properly, we think that it

---

**3.** *See, e.g., K.E.M.*, 614 Pa. 508, 38 A.3d 798 (Baer, J. dissenting) ("While [historical Justifications for the doctrine] were perhaps forceful before genetic testing could identify a biological father with pragmatic certainty, and when being born out of wedlock carried an onerous stigma, they are of little consequence today, considering that paternity can now be established readily and conclusively, and commentators estimate that forty-one percent of American births are non-marital.").

is important to note what matters are not in dispute. First, everyone agrees that P.D.K. is Child's biological father, and that this fact was known before Child was born.[4] *See, e.g.,* N.T., 11/19/2009, at 43 ("Q: [Y]ou knew [P.D.K.] was the father? [Husband's answer]: Yes. Q: Knew it before the child was even born? A: 99.9 percent, yes."). Second, no party maintains that the marriage of Husband and Mother is still intact; thus, the presumption of paternity no longer applies. Third, everyone agrees that Husband has acted as a father to Child and that it is in Child's best interests to maintain a relationship with Husband. *See, e.g.,* N.T., 2/17/2012, at 25 ("Do you think it is in [Child's] best interest to continue to have regular periods of time with [Husband]?" [Mother's answer]: "Oh, yes, I do think it's in [Child's] best interests to see [Husband]."); *id.* at 93 ("[Y]ou believe it's in [Child's] best interest to continue his relationship with [Husband], correct? [P.D.K.'s answer]: Yeah, I do."). Finally, even Husband agrees that P.D.K. should be part of Child's life, *see* N.T. 2/17/2012, at 129, and that Child should be informed, at a time when he is old enough to understand, that P.D.K. is Child's biological father, *see* N.T. 11/19/2009, at 49 ("Q: You don't believe denying [Child] knowledge of who his biological father is will have any lasting effects on the child? [Husband's answer:] At this point in time, I do not think that is the right thing to tell my son. Q: So it is something you are going to put off until later to share with him the truth as to who his biological father is? A: Yes. Q: And at that time I take it would be in his best interests to share with him the truth? A: At that time I think my son could know the difference then.").

The gist of Husband' position, as we glean it from his somewhat disjointed and rambling brief, is that P.D.K. should not have been permitted to intervene in the custody action and should be precluded from asserting his parental rights in any way because (1) Husband has always held Child out and treated Child as his own son, developing a strong father-son relationship with him and providing financial and emotional support for him throughout his life, *see* Husband's Brief at 12–15; (2) Mother cannot deny Husband's paternity because she also held Husband out as Child's father after inducing Husband "by fraud and deceit to stay and live together as an intact family," *id.* at 19; P.D.K. has not been involved in Child's life, has never supported Child, waited too long to assert his rights, and "does not have clean hands and is not entitled to any equities," *id.* at 18; and it is in child's best interests to protect his relationship with Husband and not force him into a relationship with P.D.K., "a man whom the child really does not know and is confused over his role." *Id.* at 14, 16.

We are not persuaded by any of Husband's arguments. We see no error in the trial court's application of the doctrine of paternity by estoppel in its traditional sense for the following reasons. First, neither of the parties who actively participated in the fiction that Husband is the biological father of Child is attempting to sever Husband's relationship with Child. Second, all parties agree that continuing Husband's relationship with Child is in Child's best interests. *See* N.T., 2/17/2012, at 20 ("Q: What ... do you think is in [Child's] best interest as far as his relationship with [Husband]? [Mother's an-

---

**4.** We note that, although the trial court awarded Joint legal custody and periods of physical custody to P.D.K., there is no order of court declaring that P.D.K. is Child's bio- logical father. Because all parties have acknowledged his parentage on the record, however, the lack of an order does not impact our review of this case.

swer:] I think to always get to, you know, see [Husband] and have time with [Husband], because they do have a relationship there."); *id.* at 64 ("Q: You understand the importance of [Husband] remaining a presence in [Child's] life? [P.D.K.'s answer:] Oh, yeah."). Third, the custody order entered by the trial court in fact awards shared physical custody of Child to Husband. Thus, contrary to Husband's characterization, the trial court actually **did** employ the doctrine, and to Husband's benefit, as it has allowed Husband to continue the relationship he established with Child rather than deny Husband custody rights due to his lack of biological parentage.

The real question before us is whether equitable estoppel precludes P.D.K. from pursuing parental rights due to the time lapse between Child's birth and P.D.K.'s filing his petition to intervene. We hold that it does not.

P.D.K. accompanied Mother and Child to a doctor's appointment when Child was two weeks old and took photographs of Child and him together. N.T., 11/17/2009, at 11–12. P.D.K. at that point informed Mother that he wished to be involved in Child's life and would pursue the matter in court if necessary. *Id.* at 12. Mother reacted negatively to P.D.K.'s expressed desire and cut off communications with P.D.K. despite his continued efforts to contact her about Child. *Id.* at 13. P.D.K. then hired a lawyer who sent correspondence to Husband and Mother requesting DNA testing and time with Child. *Id.* Mother and Husband refused P.D.K.'s requests, authorized their attorney to inform P.D.K.'s counsel that Mother denied having had an intimate relationship with

P.D.K., and demanded evidence of the alleged relationship. N.T., 11/19/2009, at 40. When P.D.K.'s providing mobile telephone records and photographic evidence of his relationship with Mother did not produce the desired results, P.D.K. filed a complaint for partial custody. Husband and Mother filed preliminary objections to P.D.K.'s complaint, alleging that Mother was shocked to have received P.D.K.'s custody complaint because "she has asserted since the birth of [Child] that [Husband] is the natural father of said child." Trial Court Opinion, 12/6/2012, at 2 (quoting Defendant's Preliminary Objections to Plaintiff's Complaint, $ 5, filed at docket number 2007–573 (CCP Cambria 2007)).

As a result of what Husband admits was a lie, *see id.* at 2 n. 4, P.D.K.'s custody complaint was dismissed with prejudice. P.D.K. took no further action at that time, "fearing legal retaliation which he believed could prevent him from being involved in [Child's] life." Trial Court Opinion, 12/6/2012, at 3 n.5 (citing N.T., 11/17/2009, at 28–35). After learning that Mother and Husband had separated, P.D.K. renewed his attempts to obtain DNA testing and to become involved in Child's life. Ultimately, having renewed his relationship with Mother and obtaining DNA testing with her consent, P.D.K. petitioned to intervene in the instant custody action.[5]

We agree with the trial court that these facts do not warrant a finding that P.D.K. is equitably estopped to assert his paternity. P.D.K. did not delay in asserting his parentage after Child was born, having immediately attempted to be part of Child's life, both through Mother's consent and then by taking legal action. *Compare V.E. v. W.M.,* 54 A.3d 368, 371 (Pa.Su-

---

**5.** The trial court noted that it is the fact that P.D.K. continued to seek proof of his fatherhood, rather than the actual DNA test results themselves, that it found relevant to its determination, as it was evidence that P.D.K. "actively pursued custody of the minor child." Trial Court Opinion, 12/6/2012, at 6 n.9.

per.2012) (holding estoppel inapplicable when the complaint filed when the child was nine days old and DNA testing was ordered at the time the child was four months old: "it is impossible for a four month old child to suffer any damaging trauma ... as there has been an insufficient amount of time for any bonding to have occurred between any father and child."); *with B.K.B., supra* (nine years' delay), *In re M.J.S., supra,* (three years' delay), and *Buccieri, supra* (eight years' delay). The reason P.D.K.'s paternity was not adjudicated back when Child was only six months old, and why Husband has been able to establish himself as Child's "psychological father" in the interim, is because Husband and Mother [6] lied to counsel and the court about Mother's relationship with P.D.K. and his parentage of Child.[7] Because the actions of Husband and Mother "frustrated [P.D.K.'s] ability to seek custody or visitation," *C.T.D.,* 653 A.2d at 31, the trial court properly declined to utilize the doctrine of equitable estoppel to prevent his intervention in the custody matter.

■ Finally, Husband argues that the trial court abused its discretion in finding that Child's best interests are served by awarding shared custody to P.D.K. Husband waived this issue by failing to file exceptions to the hearing officer's report.

Within twenty days after the date the hearing officer's report is mailed or received by the parties, whichever occurs first, any party may file exceptions to the report or any part thereof, to rulings on objections to evidence, to statements or findings of fact, to conclusions of law, or to any other matters occurring during the hearing. Each exception shall set forth a separate objection precisely and without discussion. **Matters not covered by exceptions are deemed waived** unless, prior to entry of the final order, leave is granted to file exceptions raising those matters. If exceptions are filed, any other party may file exceptions within twenty days of the date of service of the original exceptions.

Pa.R.C.P. 1915.4–2(b)(4) (emphasis added).

The hearing officer filed a summary with a proposed custody order on March 8, 2012. Mother filed exceptions on March 21, 2012. Husband never filed exceptions. Husband thereby waived his objections "to the report or any part thereof, to rulings on objections to evidence, to statements or findings of fact, to conclusions of law, or to any other matters occurring during the hearing." *Id.*

Even if Husband had preserved the issue for our review, we would not disturb the trial court's order. The record reflects that the hearing officer thoroughly considered the statutory factors relevant to custody determinations, as well as the testimony of a psychologist concerning the custody evaluation she performed. The evidence showed that Mother and P.D.K. are engaged to be married, and live together in a house that is in the same school district as the house where Husband lives with his and Mother's daughters. Mother and P.D.K. testified that Child's bond with P.D.K. had grown substantially in the prior two years, with Child referring to P.D.K. as "daddy." N.T., 2/17/2012, at 26, 64. Mother and P.D.K. testified that they believed that Child's best interests would be served by

---

6. We note that Mother claimed, and the trial court appears to have accepted, that Husband coerced her into holding Child out as Husband's son. *See* Trial Court Opinion, 12/6/2012, at 6.

7. Accordingly, it is Husband, not P.D.K., who arguably could be denied equitable relief due to his unclean hands.

awarding Mother physical custody during the school week, with Husband to have custody on weekends. *See id.* at 20, 49. Conversely, Husband testified that it would be "terrible" to have Child only on weekends, and that he would not want to limit Mother to weekend custody either. *See id.* at 129. The psychologist testified that Child has a good relationship with P.D.K.; that Child was somewhat confused about P.D.K.'s role, but that she was not concerned about Child's ability to work it out over time. *See* N.T., 10/20/2011, at 8–11. The psychologist opined that it would be in Child's best interests to spend equal time with Husband and Mother, with increasing time of partial custody allotted for Child to be with P.D.K. *Id.* at 11.

Based upon this evidence, the hearing officer recommended that Husband, Mother, and P.D.K. share legal custody of Child; Mother and P.D.K. jointly enjoy physical custody of Child three days and nights each week, plus one weekend each month; and Husband have physical custody of Child at all other times. The trial court accepted the hearing officer's recommendations.

Our review of the record reveals that the hearing officer was highly conscientious in discerning Child's best interests, and recommended a custody arrangement that equitably balanced the competing interests of all persons involved. Therefore, we hold that the trial court did not err or abuse its discretion in adopting the recommendation of the hearing officer and entering the custody order of October 5, 2012.

Order affirmed.