J. A01015/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| D.J.C., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | No. 1370 WDA 2014 |
| | : | |
| K.E. | : | |

Appeal from the Order, July 18, 2014,
in the Court of Common Pleas of Potter County
Civil Division at No. 2014-140

BEFORE:  FORD ELLIOTT, P.J.E., DONOHUE AND ALLEN, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:                **FILED MARCH 6, 2015**

Appellant, D.J.C., appeals the order of the Court of Common Pleas of Potter County that denied his petition for genetic testing to establish paternity of D.L.V. ("Child") born in December of 2013.  We affirm.

The trial court set forth the pertinent facts as follows:

> [D.J.C.] is 53 years of age and is a resident of 419 State Route 19 South, Wellsville, New York.  The Defendant [K.E-V., hereafter "Mother"] is 21 years of age and presently resides at 1501 State Route 54 South, Shinglehouse, Pennsylvania.
>
> On or before January 25, of 2013, [Mother] was residing with her then fiancé [E.V.] in Shinglehouse, Potter County, Pennsylvania. Apparently a disagreement arose between [E.V.] and [Mother] to the point that she desired to leave [E.V.].  [D.J.C.] had performed some excavating work for [E.V.] and had met [Mother] at that time. [Mother] was also a friend of [D.J.C.]'s daughter. Accordingly after discussion with [E.V.], [D.J.C.] and

J. A01015/15

[Mother], it was agreed that on January 25, 2013, [Mother] would come to reside with [D.J.C.] and his children. Approximately four days after [Mother] moved to [D.J.C.'s] residence, [D.J.C.] and [Mother] engaged in sexual relations including intercourse. They continued to have regular sexual relations up to two times a day (excluding 5 days) through April 15, 2013. [D.J.C.] testified that they never used condoms or any other birth control device during the period of time he was having sexual relations with [Mother]. From the evidence presented, from the date that [Mother] moved into [D.J.C.'s] residence on January 25, 2013, through April 1, 2013, [Mother] had sexual relations only with [D.J.C.]. However, [Mother] had vacated their residence for approximately five days near the end of the month of March of 2013. After five days[,] she returned to the residence and back into the bed of [D.J.C.].

On or about April 1 through April 15, 2013, [E.V.] began to regularly visit [Mother] at [D.J.C.'s] residence. During this period of time[,] [E.V.] would often take [Mother] for drives in his vehicle where they would ingest substances and engage in sexual relations. This apparently continued through about April 15, 2013 when [Mother] finally removed herself from [D.J.C.]'s residence with the aid of [E.V.] and his friends.

[D.J.C.] noticed in April, 2013 that [Mother] was pregnant. She had previously indicated her desire to become pregnant but advised [D.J.C.] that she had been taking her birth control pills. [D.J.C.] had discovered that in fact she had not been taking the pills.

[Mother] denies that she was residing exclusively with [D.J.C.] and suggests that she regular[ly] had sexual relations with [E.V.], including at the time the child was conceived. As proof that [Mother] was residing with [D.J.C.][,] he testified that on March 30 of 2013, while [Mother] was at [D.J.C.'s] residence the local dog warden appeared and served her with a summons due to the fact that

- 2 -

her dog was running loose. As to [Mother's] claims she was not residing at the residence on March 30, 2013, the Court finds her to not be credible in this regard.

[Mother] conceived the minor child on or about March 17, 2013. The Court finds that on or about March 17, 2013 that [Mother]'s sexual relations were with [D.J.C.] alone and that she did not resume sexual relations with [E.V.] until the end of March when she moved out for 4-5 days and then after April 1, 2013.

According to [D.J.C.]'s daughter, [K.C.] who is 18 years of age[,] she recalls [Mother] moving into the residence on or about January 25, 2013, and remembers that [Mother] did leave for approximately five days near the end of March, 2013, to reside with [E.V.]. After the aforesaid five days[,] [Mother] returned to [D.J.C.'s] residence and continued [to] reside there until approximately April 15, 2013, when she vacated the premises returning to [E.V.].

[E.V.] and [Mother] are now married, having been married on December 4, 2013 and presently have an intact family. [Mother] gave birth to the [Child] on or about December [of] 2013. [Mother] listed her present husband [E.V.] as the father of the minor child on the birth certificate. [E.V.] has also executed an acknowledgment of paternity. [E.V.] has been together (excluding the time [Mother] resided with [D.J.C.]) with [Mother] for approximately three and one half years. [E.V.] testified that he loves his daughter, holds the child out as his own, and financially supports her.

According to [Mother] she moved to [D.J.C.]'s residence on February 15, 2013, and not on January 25, 2013. She claims that during the period of time that the child was conceived that [E.V.] would come to the residence and they took at least three rides together where they would have sexual relations. She does acknowledge that on or about

March 7, 2013, she had left her residence for approximately four days and was residing with [E.V.'s] sister. The Court finds [Mother] is not credible in her account as to when she had sexual relations with [E.V.].

[Mother] claims that she was at [D.J.C.'s] residence for only four weeks and that she had left on March 7, 2013 and never returned to the residence. This testimony is inconsistent with that of [D.J.C.] and his daughter [K.C.]. [Mother] is visually impaired and has no driver['s] license. When residing with [D.J.C.] all transportation for [Mother] was provided by [D.J.C.]'s children and other th[a]n the limited times when [Mother] had access to [E.V.] she was always with [D.J.C.] and h[is] children. [D.J.C.] recalls that when [Mother] finally left the residence he had discovered that she had been smoking marijuana with [E.V.] during the times when she would take vehicle rides with him and therefore [D.J.C.] had given her [an] ultimatum. On the day she finally left the residence, [Mother] was found with cuts on her legs and [E.V.] told [D.J.C.] that [Mother] had attempted to harm herself.

Trial court opinion, 7/21/14 at 1-4.

D.J.C. filed a complaint to establish paternity and for genetic testing of Child. A trial was held on July 3, 2014, and on July 18, 2014, the trial court issued an order along with findings of fact denying D.J.C.'s petition. The aforesaid order was docketed on July 21, 2014, and this timely appeal followed.

D.J.C. argues the trial court erred when it applied the presumption of paternity. We disagree.

Our standard of review of a trial court's order related to paternity is whether the trial court abused its discretion. *D.M. v. V.B.*, 87 A.3d 323,

327 (Pa.Super. 2014), citing **T.E.B. v. C.A.B.**, 74 A.3d 170, 173 n.1 (Pa.Super. 2013).

In cases where a child is conceived or born during the marriage, that child is presumed to be the offspring of his or her mother's husband. **Vargo v. Schwartz**, 940 A.2d 459, 463 (Pa.Super. 2007). This is referred to as the "presumption of paternity." **Id.** In **Brinkley v. King**, 701 A.2d 176, 179 (Pa. 1997) (plurality opinion), our supreme court explained the presumption of paternity as follows:

> [G]enerally, a child conceived or born during the marriage is presumed to be the child of the marriage; this presumption is one of the strongest presumptions of the law of Pennsylvania; and the presumption may be overcome by clear and convincing evidence that the presumptive father had no access to the mother or the presumptive father was physically incapable of procreation at the time of conception. **However, the presumption is irrebutable when a third party seeks to assert his own paternity as against the husband in an intact marriage**. [Emphasis added.]

The preservation of marriages is the purpose of the presumption of paternity. **See Fish v. Behers**, 741 A.2d 721, 723 (Pa. 1999). The presumption renders blood test results irrelevant unless and until the presumption is overcome. **See Strauser v. Stahr**, 726 A.2d 1052, 1054 (Pa. 1999). "[T]he presumption is irrebuttable when a third party seeks to assert his own paternity as against the husband in an intact marriage." **CW v. LV**, 788 A.2d 1002, 1005 (Pa.Super. 2001).

The relevant time to examine whether the marriage is intact is at the time of the challenge to a husband's paternity. *Vargo*, 940 A.2d at 463 (Pa.Super. 2007). This is a question for the fact-finder. *Id.* at 467 ("Whether the family is intact and there is a marriage to preserve are questions of fact, which, like all questions of fact, fall squarely within the realm of the fact-finder.").

The disposition of this matter turns on whether Mother and E.V. had an intact marriage at the time of the challenge to E.V.'s paternity. The trial court found that Mother and E.V. were married before the birth of Child and have remained married. Following the birth of Child, E.V. held himself out as Child's father and continues in his role as Child's father. (Trial court opinion, 7/21/14 at 10-11.) D.J.C. does not claim, nor has he ever claimed, that Mother, E.V., and Child do not live together as an intact family, or that E.V. has not assumed parental responsibility for Child. As a result, the presumption of paternity is irrebuttable. *Vargo*, 940 A.2d at 463.

Even if the presumption were rebuttable, D.J.C. failed to rebut the presumption. The presumption may be overcome by clear and convincing evidence that either of the following circumstances was true at the time of conception: the presumptive father was physically incapable of procreation because of impotency or sterility or the presumptive father had no access to wife. The trial court pointed out that when Child was conceived, Mother was living with D.J.C. and having sexual relations with him, however, Mother also

- 6 -

J. A01015/15

had "limited contact" with E.V. (Trial court opinion, 7/21/14 at 5.) The record supports the fact that E.V. was capable of having children at all times and was in no way sterile. (Notes of testimony, 7/3/14 at 93-95.) The law is clear that, absent such circumstances, the presumption of paternity continues to apply. *Vargo*, *supra*.

D.J.C. also argues that the trial court erred by failing to apply the doctrine of paternity by estoppel. In *R.W.E. v. A.B.K.*, 961 A.2d 161, 169 (Pa.Super. 2008) (*en banc*), this court stated, "[t]he doctrine of paternity by estoppel has been applied by courts to prevent putative fathers who hold themselves out as the fathers of their children from subsequently denying their parentage." Given the circumstances of the instant case, this court has no occasion to analyze paternity by estoppel.

Accordingly, for the foregoing reasons, we conclude the trial court properly applied the presumption of paternity to this matter when it denied D.J.C.'s petition for genetic testing. *See E.W. v. T.S.*, 916 A.2d 1197, 1204 (Pa.Super. 2007) (affirming the trial court's application of the presumption of paternity in a case where the mother and her husband had not lived apart at any time after their marriage and had never filed a divorce complaint, and the husband had fulfilled the duties of a father in the family).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/2015