J-A35044-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| S.B., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| H.D., a/k/a H.S., and D.G., | |
| Appellees | No. 1110 WDA 2015 |

Appeal from the Order entered June 18, 2015,
in the Court of Common Pleas of Washington County,
Civil Division, at No(s): 2014-6847

BEFORE:  BENDER, P.J.E., SHOGAN and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                    **FILED APRIL 19, 2016**

S.B. appeals from the Order denying his Petition to establish paternity and for genetic testing to prove his paternity of the minor child, K.G. ("Child"), who was born in May of 2009.  The Order also sustained the Preliminary Objections filed by D.G., the former paramour of Child's mother,[1] H.S., formerly known as H.D, ("Mother") to the Complaint for Custody filed by S.B., and dismissed the Complaint with prejudice.  We affirm.

The trial court set forth the underlying facts as follows:

> [Mother] is the biological mother of [Child.]  S.B. and [Mother] never dated[,] but had sexual relations in June and July of 2008.  When [Mother] learned that she was pregnant, S.B.

---

[1] D.G. is named as the father of Child on her birth certificate, and Mother, who had been involved in an intimate relationship with D.G. prior to Child's birth, moved in with him shortly after Child was born.  ***See*** Trial Court Opinion, 8/4/15, at 2.

claims that he provided [Mother] with money for an abortion and the two parted ways. [Mother] denied accepting money for an abortion. In fact, she denied having any conversation at all with S.B. about her pregnancy, but she agreed that they parted ways. S.B. testified that in the spring of 2009, he became aware[,] through mutual friends[,] that [Mother] was in the hospital in labor. At the hearing, he claimed that he was "lied to and told [C]hild wasn't mine." However, he also stated that it could have been as early as 2012 that others told him [that C]hild resembled him.

According to S.B., [Mother] was in a relationship with D.G. at the same time that he and [Mother] had sexual relations; however, [Mother] maintains that she and D.G. were "off" at the time that she had relations with S.B. [C]hild was not born into an intact marriage[,] as [Mother] was not married at the time [C]hild was born; however, D.G.'s name is listed as the father on [C]hild's birth certificate. [Mother] stated that she moved in with D.G. shortly after [C]hild was born.

[Mother] and D.G. are no longer in a relationship. They maintain a shared custody agreement[,] which they have consistently followed for the past three or four years. In July 2014, S.B. attended a wedding where he observed [C]hild for the first time in person. He testified that [C]hild looked like him because she was "skinny, tall, and long legged." He further stated that, "… when I turned and looked, it just gave me an eerie feeling. That I was lied to. That I was tricked." At the hearing, testimony revealed that [C]hild looks biracial.[2] …

On November 5, 2014, S.B. filed a [C]omplaint for custody against [Mother] regarding … [Child]. In an [O]rder dated December 10, 2014 [the trial court] scheduled a hearing for February 24, 2015[,] in order to determine whether D.G. should be permitted to intervene in the custody matter. In a consent Order dated December 11, 2014, D.G. was granted leave to intervene in the matter and the Prothonotary was directed to amend the caption to include D.G. On December 29, 2014, D.G. filed an [A]nswer to S.B.'s custody [C]omplaint and [N]ew [M]atter. On January 6, 2015, S.B. presented a [P]etition to establish paternity and for genetic testing, and on January 7, 2015, D.G. filed [P]reliminary [O]bjections to the custody

---

[2] S.B. is African American while Mother is Caucasian.

[C]omplaint. Thereafter, [the trial court] scheduled a hearing to take place on May 29, 2015. On April 15, 2015, S.B. submitted a brief in support of the [P]etition to establish paternity and for genetic testing. On April 30, 2015, [Mother] and D.G. submitted briefs in opposition to S.B.'s [P]etition to establish paternity. On May 20, 2015, D.G. submitted a brief in opposition to S.B.'s custody [C]omplaint, and on May 22, 2015, S.B. submitted a brief in opposition to D.G.'s [P]reliminary [O]bjections.

Trial Court Opinion, 8/4/15, at 1-3 (citations omitted, footnote added).

On May 29, 2015, the trial court held a hearing on S.B.'s Petition to establish paternity and for genetic testing, and on D.G.'s Preliminary Objections. On June 18, 2015, the trial court entered an Order denying S.B.'s Petition to establish paternity and for genetic testing, sustaining D.G.'s Preliminary Objections, and dismissing with prejudice the Complaint for Custody filed by S.B. On July 17, 2015, S.B. timely filed a Notice of Appeal,[3] along with a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

On appeal, S.B. raises one issue: "Under all the circumstances of this case, was [S.B.] estopped from claiming paternal rights with respect to [C]hild by his delay in taking action?" S.B.'s Brief at 2.

Our standard of review of a trial court's order relating to paternity is whether the trial court abused its discretion or committed an error of law. *D.M. v. V.B.*, 87 A.3d 323, 327 (Pa. Super. 2014).

---

[3] "This Court accepts immediate appeals from orders directing or denying genetic testing to determine paternity." *Barr v. Bartolo*, 927 A.2d 635, 638 (Pa. Super. 2007) (citation omitted).

An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order. Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence. It is not enough [for reversal] that we, if sitting as a trial court, may have made a different finding.

*Vargo v. Schwartz*, 940 A.2d 459, 462 (Pa. Super. 2007) (citation omitted).

S.B. challenges the trial court's finding that his delay in asserting his rights precluded him from seeking a determination of Child's paternity under the doctrine of paternity by estoppel. S.B.'s Brief at 10. S.B. claims that because Mother did not inform him that he had become a father, he was never given the opportunity to act as a father. *Id*. at 12-13, 15. S.B. asserts that he repeatedly expressed concerns about the paternity of Child, but had only second-hand reports that Child, who is biracial, resembled him, whereas both Mother and D.G. are Caucasian. *Id*. at 10, 16; *see also id*. at 15 (wherein S.B. states that neither Mother nor D.G. denied that he could be the father of Child). S.B. argues that, if, at the time of Child's birth, the complexion of Child puzzled Mother, she could have inquired about the biracial appearance of Child. *Id*. at 16. S.B. points out that, when he saw Child in person, he acted promptly to establish paternity through genetic testing. *Id*. at 12. S.B. alleges that while Child will inevitably learn that D.G. is not her biological father, he does not seek to shut D.G. out of Child's life. *Id*. at 16, 18; *see also id*. at 16-17 (wherein S.B. claims that if his

paternity if confirmed, a determination as to a new custody arrangement should be conducted with Child's best interests in mind). S.B. urges that we should reverse the trial court Order and allow genetic testing so that Child will know that her birth father did not abandon her. *Id*. at 18.

In making a legal determination of the paternity of a child, we must consider the following:

> [F]irst, one considers whether the presumption of paternity applies to a particular case.[4] If it does, one then considers whether the presumption has been rebutted.[5] Second, if the presumption has been rebutted or is inapplicable, one then questions whether estoppel applies. Estoppel may bar either a plaintiff from making the claim or a defendant from denying paternity.

*N.C. v. M.H.*, 923 A.2d 499, 502-503 (Pa. Super. 2007) (citation omitted, footnotes added); *see also K.E.M. v. P.C.S.*, 38 A.3d 798, 810 (Pa. 2012) (holding that "paternity by estoppel continues to pertain in Pennsylvania, but it will apply only where it can be shown, on a developed record, that it is in the best interest of the involved child.").

---

[4] "The presumption of paternity, *i.e.*, the presumption that a child conceived or born during a marriage is a child of the marriage, has been described by our Supreme Court as one of the strongest presumptions known to the law." *Vargo*, 940 A.2d at 463 (citation and quotation marks omitted). Because the policy underlying the presumption is the preservation of marriages, the "presumption of paternity applies only where the underlying policy to preserve marriages would be advanced by application of the presumption." *Id*. "When there is no longer an intact family or a marriage to preserve, then the presumption of paternity is not applicable." *Id*.

[5] "In Pennsylvania, impotency/sterility and non-access constitute the only ways to rebut the presumption of paternity." *Vargo*, 940 A.2d at 463. "Notably, blood tests cannot be offered to rebut the presumption of paternity." *Id*.

Paternity by estoppel is merely the legal determination that because of a person's conduct (*e.g.*, holding the child out as his own or supporting the child), that person, regardless of his true biological status, will not be permitted to deny parentage…. The law will not permit a person in these situations to challenge the status that he or she has previously accepted. The doctrine of paternity by estoppel seeks to protect the interests of the child.

Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father [s]he had known all h[er] life is not in fact h[er] father.

… [I]f there is no difference in the supportive relationship available from the psychological and biological fathers, we conclude that the responsibility for fatherhood should lie with the biological father.

The doctrine has most usually been applied to (1) preclude a man who had held a child out as his own from avoiding further support of the child after his relationship with the mother had ended; or (2) preclude a woman who had held one man out as her child's father from seeking support from another man later on. In other words, those who mislead a child as to the identity of his or her natural father, [*sic*] cannot then turn around and disprove their own fiction to the detriment of the child.

Yet, estoppel also can serve to preclude a biological father from asserting his parental rights.

\*\*\*

[I]f a biological father is not obstructed from pursuing his parental claim and he acquiesces in the fiction that someone else is his child's father, the doctrine of estoppel may be invoked to bar his later attempt to assert his rights.

***T.E.B. v. C.A.B.***, 74 A.3d 170, 173-75 (Pa. Super. 2013) (citations, quotation marks, brackets, and some paragraph breaks omitted). "[W]here estoppel is applied, blood tests may be irrelevant, for the law will not permit

a person in estoppel situations to challenge the status which he or she has previously accepted. Only when estoppel does not apply will blood tests be ordered." *D.M.*, 87 A.3d at 327 (citation omitted).

With regard to a fraud allegation in a paternity case, our Court noted the following:

> In *B.O. v. C.O.*, 404 Pa. Super. 127, 590 A.2d 313 (1991), this Court stated that "when an allegation of fraud is injected in [an acknowledgement of paternity] case, the whole tone and tenor of the matter changes. It opens the door to overturning settled issues and policies of the law." *B.O.*, 590 A.2d at 315. This Court went on to create a narrow fraud exception for challenging paternity, which is otherwise a settled issue based on the signed acknowledgment. We adopted the traditional elements of fraud established in Pennsylvania jurisprudence:
>
> > (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result.
>
> *Id*.
>
> Recent cases have moved away from this rigid five-prong test[,] which this Court acknowledged in *B.O.* as problematic and somewhat circular. *B.O.*, 590 A.2d at 315. Our recent decision of *Glover v. Severino*, 946 A.2d 710 (Pa. Super. 2008), provides additional guidance as to the elements of fraud in the context of challenges to acknowledgments of paternity:
>
> > A misrepresentation need not be an actual statement; it can be manifest in the form of silence or failure to disclose relevant information when good faith requires disclosure. Fraud is practiced when deception of another to his

> damage is brought about by a misrepresentation of fact **or by silence when good faith required expression**. Fraud comprises anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether by direct falsehood or innuendo, by speech or silence, word of mouth, or look or gesture.
>
> *Id*. (quotations and citations omitted) (emphasis in original).

*R.W.E. v. A.B.K.*, 961 A.2d 161, 167-68 (Pa. Super. 2008).

Here, the trial court found that S.B. was estopped from asserting his alleged parental rights[6] based on the following:

> In the present case, S.B. seeks to establish that he is the father of … [C]hild, and he intends to seek custody if verified by a paternity test. However, the [c]ourt finds that he is estopped from asserting a claim of paternity, thus no blood tests can be ordered. S.B.'s failure to act during the first five or six years of [C]hild's life effectively estops him from now raising a claim of paternity.
>
> Specifically, S.B. testified that he "heard that [Mother] was at the hospital delivering." Hrg. Transcr. 23:19-20; Hrg. Transcr. 32:6-12. When [C]hild was one year old, he started to think that [C]hild was his. Hrg. Transcr. 53:2-5. He stated that he has seen pictures of [C]hild, and he also noted that when the baby was about a year old, she started to look biracial. Hrg. Transcr. 48:20-21; Hrg. Transcr. 52:24-25. Further, S.B. admitted that as early as 2012, he was informed that [C]hild resembled him. Hrg. Transcr. 37:2-8. Despite this information, he did not come to court at this time. Hrg. Transcr. 37:18-19. When asked why he did not come to court sooner, S.B. stated that he "didn't want this to be a bad situation" because the parties have mutual friends. Hrg. Transcr. 42:2-3. When pressed further, he admitted he "did not have the financial means." Hrg. Transcr. 43:20-21. He also stated that he has

---

[6] S.B. notes that the presumption of paternity is not applicable in this case because Mother never married D.G. **See** S.B.'s Brief at 10.

always had concerns but "didn't know the proper channels to take." Hrg. Transcr. 46:14-15. Based on the aforementioned, it is evidence that he should have acted sooner.

The testimony of T.S. supports the notion that S.B. was aware that [C]hild may be his and that he simply waited too long to act. T.S., who graduated from high school with the parties, testified at the hearing. According to T.S., during the first year of [C]hild's life, she and S.B. had a conversation at the [bar] where she was a bartender at the time. Hrg. Transcr. 64:13-21. S.B. was drinking during the conversation. According to T.S., S.B. informed her that he was aware that [Mother] was pregnant, he had given her money to get an abortion, and he knew that she did not get the abortion. T.S. further testified that S.B. stated during this conversation that he knew that [C]hild was his. Hrg. Transcr. 65:5-8. T.S. stated she had several subsequent conversations with S.B. over the years, and "It was always the same thing. Just, you need to get a hold of [Mother] You need to tell her … I want to see my daughter. I'm going to take her to court … it was always the same thing." Hrg. Transcr. 66:22-25. According to T.S., S.B. never asked her for [Mother]'s phone number. Hrg. Transcr. 67:18-20.

Despite testimony which clearly points to the fact that S.B. knew he may be the biological father of [C]hild, he waited approximately five years to seek court intervention. [C]hild is now six years old and D.G. is the only father she has ever known. D.G. has cared for [C]hild her entire life. The [c]ourt finds that S.B.'s conduct precludes him from intervening and disrupting [C]hild's life at this point in time. He cannot be permitted to challenge a status[,] which he previously accepted.

Trial Court Opinion, 8/4/15, at 5-6 (citation omitted). We agree.

Moreover, with regard to S.B.'s claim that Mother had committed

fraudulent misrepresentation by omission, the trial court found the following:

The evidence in this case does not amount to [] a finding [of fraud]. There is no evidence that [Mother and D.G.] misrepresented anything to S.B.[,] nor is there any evidence that S.B. actually relied on an alleged misrepresentation. S.B. claims that he could not locate or contact [Mother] and that he was tricked. However, the testimony revealed that the parties

have numerous friends. According to [Mother], she has had the same cell phone number for two and a half to three years. Hrg. Transcr. 78:17-25. Her number has always been in the white pages of the phone book under her maiden name. Hrg. Transcr. 79:24-25. She has maintained a Facebook account since late 2009 or early 2010 and posts pictures of [Child] to this page. Hrg. Transcr. 82:17-22. She informed the [c]ourt that S.B. was not blocked from her [F]acebook page until November 2014 when these proceedings ensued. Hrg. Transcr. 83:7-10. Additionally, S.B. knows where D.G. lives and admitted that he has seen [F]acebook pictures on D.G.'s [F]acebook page. It is evidence to the [c]ourt that [Mother] and D.G. could have been reached, and there is no evidence to suggest that they did anything to prevent S.B. from contacting them. S.B. himself admitted he would have sought court intervention sooner, but he did not have the financial means, he did not know the proper channels, and he did not want to create a bad situation. Hrg. Transcr. 43:13-18; Hrg. Transcr. 46:14-15; Hrg. Transcr. 42:2-3. This proves that he was not misled[,] nor did he rely on any alleged misrepresentation.

The evidence clearly demonstrates that S.B. waited too long to assert his rights, and his inaction is not the product of fraud. Therefore, paternity by estoppel is applicable, and S.B. is precluded from proceeding any further in asserting parental rights.

Trial Court Opinion, 8/4/15, at 7-8. We further note S.B. testified that, as early as 2012, people had informed him of Child's resemblance to him. N.T., 5/29/15, at 37; *accord* Trial Court Opinion, 8/4/15, at 2.

The trial court's findings, *i.e.*, that S.B. waited too long to assert his rights as Child's father while acquiescing to Mother's paramour, D.G., as the father of Child, and that Mother did not commit fraud, are supported by the record. **See** Trial Court Opinion, 8/4/15, at 5-8; **see also B.K.B. v. J.G.K.**, 954 A.2d 630, 636 (Pa. Super. 2008) (concluding that the alleged biological father's failure to pursue parental rights until child was nine years old

estopped him from challenging the mother's former husband's status as the child's father); ***Moyer v. Gresh***, 904 A.2d 958, 962 (Pa. Super. 2006) (concluding that where biological father voluntarily relinquished his parental rights to another man during the first nine years of child's life, biological father was estopped from asserting his parental rights towards the child); ***In re M.J.S.***, 903 A.2d 1, 10 (Pa. Super. 2006) (holding that the biological father was estopped from asserting paternity where he knew that another man had been named the father, and despite having the right to acknowledge paternity, he waited to assert paternity until three years after the child had been adopted); ***Buccieri v. Campagna***, 889 A.2d 1220, 1228 (Pa. Super. 2005) (holding that where the putative father was inactive for eight years, he was "estopped by his own past conduct from obtaining genetic tests to establish his paternity and/or assert his paternal rights"). As the trial court's findings are supported by competent evidence, we will not disturb them. ***See Vargo***, 940 A.2d at 462. Accordingly, we affirm the trial court Order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/19/2016